924 So.2d 1135 (2006)
William Erik LUPLOW, Sr., Plaintiff-Appellee
v.
Jennifer Michelle LUPLOW, Defendant-Appellant.
No. 41,021-CA.
Court of Appeal of Louisiana, Second Circuit.
February 28, 2006.
*1137 Samuel P. Love, Jr., Shreveport, for Appellant.
Kitchens, Benton, Kitchens & Black by Clinton C. Black, Minden, for Appellee.
Before STEWART, GASKINS and CARAWAY, JJ.
*1138 GASKINS, J.
In this child custody case, the mother appeals from trial court judgments designating the father as the primary domiciliary parent of the parties' two minor children and awarding the father monthly child support of $200. We affirm the trial court judgment pertaining to custody; however, as to the supplemental judgment addressing child support, we amend and render.

FACTS
The parties, William Erik Luplow, Sr., and Jennifer Michelle Luplow, were married in 1995. Two children were born of the marriage: William Jr. or "Bo" (DOB 12/8/98), and Samantha (DOB 4/5/01). The parties separated in May 2004.[1] At the time, the parties were living in Haughton, Louisiana, while the father was stationed at Barksdale Air Force Base in Bossier City, Louisiana.
In June 2004, the father filed a petition for divorce under La. C.C. art. 102. He requested custody of the children with the mother having reasonable visitation and sought use and occupancy of the family home.
In her petition, the mother requested joint custody with her being designated as domiciliary parent. She also requested use and occupancy of the family home. She later asked that the custody matter be submitted to a mediator. Mediation was successful, and the parties entered into a consent judgment that awarded joint custody of the children with the parents being co-domiciliary parents. Under the implementation plan, the children alternated between the parents every two to three days. The father was designated to pick up the children from school every day. The plan directed that the children's residence not be moved more than 150 miles from Caddo and Bossier Parishes without a court order or a written supplemental plan. The father was ordered to pay the mother monthly child support of $84.15 and to maintain health insurance coverage on the children. The judgment was signed on January 18, 2005.
The parties were divorced in February 2005. The father remarried in April 2005. His present wife, LaDonna, has two daughters; while she has custody of the 11-year-old one, the 13-year-old one lives with her father in Keithville, Louisiana.
In May 2005, the father filed an objection to the mother's proposed move to Redwater, Texas. The father also stated that he recently had been transferred to Wichita Falls, Texas, for retraining with the United States Air Force and that he would be stationed permanently in Phoenix, Arizona, as of June 21, 2005. He requested that he be designated primary domiciliary parent.
The mother filed a rule to show cause seeking either sole custody of the children or joint custody with her being designated as the domiciliary parent.
In June 2005, an interim order was filed specifying the division of the physical custody of the children from June 2, 2005 to August 5, 2005. The parties were ordered to immediately submit to a child custody evaluation conducted by Leigh Ann O'Brien, a licensed clinical social worker.
Trial was held on August 5 and 9, 2005. At the conclusion of the evidence, the trial *1139 court stated that both parties were good parents and that it was relying upon the report by Ms. O'Brien. As a result, the trial court awarded joint custody with the father being designated the primary domiciliary parent of the six-year-old son and four-year-old daughter. The court did, however, specifically warn the father against doing "spiteful things or do anything to keep these kids ... away from seeing their mother and their maternal grandparents." The judgment, which was signed on September 20, 2005, also required the father to submit the children for counseling. The father was ordered to maintain health insurance on the children. The issue of child support was reserved pending an exchange of financial records between the parties; if the parties were unable to come to an agreement, the court would set the amount.
The mother filed a motion for new trial. It was argued and denied on October 13, 2005. In connection with the motion, the mother proffered tapes of telephone conversations in which the father and the stepmother allegedly accused the mother and the maternal grandparents of various misconduct and threatened them.
Additional evidence on child support was taken on October 13, 2005. In a supplemental judgment signed on November 10, 2005, the court ordered that the mother pay the father monthly child support of $200 in weekly installments of $46.15. It also directed that the father pay 80 percent of the children's uncovered medical and dental expenses while the mother was to pay 20 percent.
The mother appeals.

CHILD CUSTODY

Law
The paramount consideration in any determination of child custody is the best interest of the child. La. C.C. art. 131; Evans v. Lungrin, XXXX-XXXX (La.2/6/98), 708 So.2d 731.
In cases where the original custody decree is a stipulated judgment and the rule of Bergeron v. Bergeron, 492 So.2d 1193 (La.1986), is inapplicable, the party seeking modification must prove (1) that there has been a material change of circumstances since the original custody decree was entered, and (2) that the proposed modification is in the best interest of the child. Evans v. Lungrin, supra.
In determining the best interest of a child in custody cases, there must be a weighing and balancing of factors favoring or opposing custody in respective competing parents on the basis of evidence presented in each particular case. Hoskins v. Hoskins, 36,031 (La.App. 2d Cir.4/5/02), 814 So.2d 773.
According to La. C.C. art. 134, the relevant factors to be considered in determining the best interest of the child may include the following:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.

*1140 (6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.
The court is not bound to make a mechanical evaluation of all of the statutory factors listed in La. C.C. art. 134, but should decide each case on its own facts in light of those factors. The court is not bound to give more weight to one factor over another, and when determining the best interest of the child, the factors must be weighed and balanced in view of the evidence presented. Hoskins v. Hoskins, supra. Moreover, the factors are not exclusive, but are provided as a guide to the court, and the relative weight given to each factor is left to the discretion of the trial court. McIntosh v. McIntosh, 33,908 (La.App. 2d Cir.8/31/00), 768 So.2d 219.
The trial court's finding that joint custody is in the best interest of the child does not necessarily require an equal sharing of physical custody. Collins v. Collins, 36,629 (La.App. 2d Cir.10/23/02), 830 So.2d 448. Substantial time rather than strict equality of time is mandated by the legislative scheme providing for joint custody of children. Jones v. Jones, 38,790 (La.App. 2d Cir.6/25/04), 877 So.2d 1061.
Underlying the trial court's great discretion in child custody cases is its opportunity to better evaluate the credibility of witnesses. Accordingly, the trial court's determination of custody issues is afforded great weight and will not be disturbed on appeal absent an abuse of discretion. Hoskins v. Hoskins, supra.
Regarding the testimony of an expert in a custody matter, after weighing and evaluating expert and lay testimony, the trial court may accept or reject the opinion expressed by any expert. Peacock v. Peacock, 39,950 (La.App. 2d Cir.5/4/05), 903 So.2d 506.
The ultimate "best interest of the child" decision remains squarely in the exclusive province of the trial court, a decision which necessarily focuses on all of the evidence and testimony presented. Peacock, supra.

Testimony
Like the father, Melissa Horton was in the air force. She described her relationship with the father as being akin to that of siblings. She became close enough to both the father and the mother to have attended family functions and even a ski trip that included the mother's parents. Based upon her observations, the mother tended to the children and disciplined them. She testified that she observed the mother struggle with her physical and emotional health before undergoing a partial hysterectomy in September 2004; after the surgery, the mother improved greatly in many respects, including her care of the children. Although she observed isolated incidents prior to the surgery when the mother would raise her voice to the children, she had not seen any after the hysterectomy.
*1141 Mrs. Horton testified that her friendship with the father deteriorated as he ended his marriage and began making choices with which she could not agree. When she failed to agree with him, he "quit" their friendship and became closer to Shannon Broyles, who told Mrs. Horton that the father "deserved better" than the mother and that she had a friend she wanted to introduce to him.
Don Broyles, an air force major, and his wife Shannon were friends of the father. The father lived with them for at least a month after he and the mother separated; he was a loving father who disciplined the children if necessary. Broyles testified that in his opinion the children were a "nuisance" to the mother. Although he said that she "yelled" at her children, it was not frequent. On two occasions, he heard her scream at the son to shut up; he felt this was mistreatment. He admitted that he never saw her abuse the children and that he had not seen her at all since her surgery. As to the father, Broyles stated that he had seen him let the children "get away" with things and manipulate him; he had also observed the father spanking the boy in public, which he felt was inappropriate.
Shannon Broyles testified that she felt that the children were "a burden" to the mother and that she lacked good coping skills. She admitted telling the father and Mrs. Horton that he deserved better than the mother but denied saying that she had a woman lined up for him while he was still married. She admitted that she never saw the mother abuse the children and that the mother was the one who disciplined the children.
Stacy Fox, a former daycare worker, testified that she worked at the children's daycare center for about eight months. According to her trial testimony, the father participated in more events at the daycare center than the mother and the children were more "normal" when he dropped them off. However, she stated that to her knowledge both parties were good parents.
The father's mother, Mildred House, testified about her tumultuous relationship with him. She testified as to the problems she had experienced with him because she refused to facilitate his relationship with his girlfriend, LaDonna, whom he later married. She had refused to take LaDonna with her when she drove the children to visit him while he was training in Florida or to allow her to come to her home Christmas morning. She stated that he had removed $1,000 from her savings account without her permission and that the day following his wedding to LaDonna he sent her an eviction letter. It ordered her to vacate the trailer home in which she had been living; although it was in his and Jennifer's names, the grandmother had been paying for the trailer. She said she had called the police when her son came to the trailer, began rifling through her file cabinet, and frightened her by acting like "a wild man." According to the paternal grandmother, the father is estranged not only from her but also from his sister. She testified that she was concerned that he would not allow her to see the children if he received custody. At the time of the hearing, she was temporarily living with the mother and helping care for the children who were no longer in daycare. She admitted that her son loves his children, but she stated that she did not believe he was putting their needs first or that he was sensitive enough to have custody.
Mrs. House testified that she spoke to Ms. O'Brien about her concerns about her son. However, none of this material was contained in Ms. O'Brien's report.
*1142 Leigh Ann O'Brien testified that while both of the parties were good parents, she recommended that the father receive custody because "[t]here have been problems" with the mother. However, she stated that she was not saying that the father was the "better parent." He had "gone above and beyond" to assure her that he would continue the relationship with the mother and the grandparents. She felt that he was the more stable parent at this time and that he could afford to fly the children back to see their mother once per month. However, should he fail to do so, she did not know what that would do to her opinion. She suggested that the children be reevaluated in February 2006 by herself or another health care professional. Because she expected them to be reevaluated at that time, her report did not mention her expectation that the mother would receive extensive visitation.
Although she said she did not ask the children who they preferred to live with, she felt a six-year-old, the age of the parties' son, was old enough to make that decision. She said that the children indicated that they wanted to live with the maternal grandparents.
Ms. O'Brien admitted speaking to the paternal grandmother who gave negative statements about the father, yet none of this information was in the report. Ms. O'Brien said alternatively that she didn't include it because she validated the same information from other sources, then that she did not include the information from the paternal grandmother because the children did not mention her. Later she stated that "due to other situations right now, was probably a miss...."
The maternal grandparents, Vernon and Lonnie Creed, testified that their daughter had secured employment at a dress store in Redwater and that they had property near their house where her trailer home could be placed for her and the children. They described the local school which the children would attend if they lived with their mother; two relatives worked there. They also noted that the children had been essentially raised in their church and would continue to attend it when they were in Redwater.
Mr. Creed observed that certain information they had provided to Ms. O'Brien was not in her report. He testified that he had told her about the father's quick temper. He recounted an incident when he saw the father slap the son in the face while they were getting ready for church.
The Creeds also testified that their daughter's physical and emotional health had improved greatly since her surgery and that she was better able to handle stress. Prior to the surgery, Mrs. Creed said that she had cried because of the way her daughter treated the children. Mr. Creed admitted that he would not have stayed as long as the father did. They expressed great concern over the children being in the care of the stepmother, a person about whom they had virtually no information.
As to the accusations of her yelling at the children, the mother stated that there were problems with the marriage that caused tensions in the household at that time. She also noted her health problems, which she maintained had vastly improved since her partial hysterectomy. She was able to stop taking Prozac three months after the surgery. She also felt she had benefited from counseling and speaking with her parents' minister. She denied the father's allegations that she dumped the children on her parents at every possible opportunity. She said that while she might occasionally let the children spend time with her parents without her, most of the time she was also present. She also noted that she was the children's primary *1143 caregiver from February 2005 to June 2005 when the father was attending a school in Texas. She said she wished to move back to Redwater to be close to her family.
As to the testimony of the daycare worker, the mother testified that she could not participate often at events at the daycare center because she was paid by the hour and thus unable to miss much work. Also she questioned the worker's assessment as to how the children behaved when the father dropped them off because he left the children there an hour and a half before the worker arrived at the daycare center. Due to prior incidents, the mother questioned whether statements made by the children to Ms. O'Brien were coached by the father, who accompanied them on two of their visits to Ms. O'Brien. Of particular concern to her was a statement that the children supposedly made about wishing that she would spend more time with them and less on the computer; she testified that she had not used her home computer in almost a year because she did not have internet access. She also stated that Ms. O'Brien had assured her at one of their appointments that she would recommend that the mother be named the domiciliary parent. (Ms. O'Brien denied making this statement.)
The father insisted that he planned to retire from Luke Air Force Base in Phoenix and that he could not be deployed overseas because he now has sleep apnea. However, he conceded that he could be transferred anywhere in the United States at any time, particularly in about 32 months when he reached his next skill level. Additionally, he has been sent overseas twice.
He testified that the mother was short tempered with the children. He said she physically abused the children by spanking too hard. He said that he and the mother went to counseling, but she refused to go back. (According to the mother's version, the father was the one who refused to return to counseling.) However, he admitted that he agreed to the mother having shared custody during the separation.
He initially denied having any fault in the breakup of the marriage. He also denied responsibility in the deterioration of his relationships with his mother and sister. He stated that he did not get angry at his mother for denying his requests pertaining to his girlfriend. He admitted sending his mother an eviction letter. However, he maintained that he wanted to reconcile with both her and his sister but that his efforts had been rebuffed.
Should the children live with him, the father testified that he and his current wife have a four-bedroom house in Phoenix. Although the stepmother has two daughters, only one of them lives with her, so each of the children would have his or her own bedroom. The stepmother is not currently employed and will be able to stay home to care for the children. She did not testify at the hearing.

Trial Court Ruling
Instead of going through the "laundry list" of factors in La. C.C. art. 134 or the relocation statute, La. R.S. 9:355.1, et seq., the trial court stated that such a review was unnecessary in this case because it would end up with the same conclusion  that the children have "two good parents." The court concluded that the matter came down to a determination of what was in the "best emotional and psychological interest" of the children. Finding itself untrained in making such a determination, the court deferred to Ms. O'Brien, a mental health professional. The court then went on to praise the maternal grandparents for their relationship with the children.
*1144 After naming the father the primary domiciliary parent, the court nonetheless found it necessary to issue a stern warning to him:
And just one other thing, I would just caution you, Mr. Luplow, that the quickest way that you can get this turned around and it go the other way is to take the position that you, quote/quote, were the winner, because there's not any winner, and do things, do spiteful things or do anything to keep these kids, you know, away from seeing their mother and their maternal grandparents....

Discussion
While a "mechanical" evaluation of all of the statutory factors is not mandated, an articulation of the trial court's consideration would have been helpful, especially in a close case such as the present one. However, our review of the record reveals a basis for finding that placement with the father is in the best interest of the children. The mother's emotional and health issues have caused her to deal with the children in a more stringent manner than the father. In view of the trial court's opportunity to better evaluate the credibility of witnesses, we must defer to the trial court's finding that the father was the more stable parent.
As to the evidence proffered by the mother on her motion for new trial, we note that any violation by the father of the trial court's judgment is a basis for either contempt proceedings or a petition for modification of custody. Should any failure to comply by the father be shown in a resulting proceeding, the trial court  which advised the father in strong terms against violating the provisions of the custody plan  would have several options, ranging from holding the father in contempt, altering the custody arrangement, or requiring the father to post security under La. R.S. 9:355.14.
The mother has expressed concerns about the children's welfare should the father be deployed and the children left in the care of the stepmother. Custody rights are not assignable. See Lebo v. Lebo, XXXX-XXXX (La.App. 1st Cir.6/25/04), 886 So.2d 491. This matter should be addressed when and if it arises.
Based on our review of the record, we find no manifest error in the trial court's judgment awarding domiciliary custody to the father.

CHILD SUPPORT

Law
Child support is a continuous obligation of both parents; children are entitled to share in the current income of both parents and should not be the economic victims of divorce. La. R.S. 9:315(A).
Income means the actual gross income of a party, if the party is employed to full capacity. La. R.S. 9:315(C)(5)(a). In the case of a party who is voluntarily unemployed or underemployed, La. R.S. 9:315(C)(5)(b) and 9:315.2(B) provide that income means the potential income of the party and, in such a case, gross income is calculated according to La. R.S. 9:315.11. Peacock, supra. A party shall not be deemed voluntarily unemployed or underemployed if he or she is absolutely unemployable or incapable of being employed, or if the unemployment or underemployment results through no fault or neglect of the party. La. R.S. 9:315(C)(5)(b); Wyatt v. Wyatt, 39,518 (La.App. 2d Cir.4/6/05), 899 So.2d 788.
When determining whether a party is underemployed for purposes of calculating a child support obligation, the court shall consider that party's earning capacity *1145 in light of all circumstances. Peacock, supra.
When a parent voluntarily terminates his or her employment, the child support obligation may be reduced if the obligor parent can show that (1) a change in circumstances occurred; (2) the voluntary change is reasonable and justified; (3) the parent is in good faith and not attempting to avoid his or her alimentary obligation; and (4) the action will not deprive the child of continued reasonable financial support. Hutto v. Kneipp, 627 So.2d 802 (La.App. 2d Cir.1993); Wyatt, supra.
Voluntary underemployment is a question of good faith of the obligor spouse. Wyatt, supra. The trial court has wide discretion in determining the credibility of witnesses. A determination by the trial court of whether the obligor spouse is in good faith in ending or reducing his or her income is a factual determination which will not be disturbed on appeal absent an abuse of the wide discretion of the trial court. Wyatt, supra.
La. R.S. 9:315.14 provides, in relevant part, that the court shall not set an award of child support less than $100.00, except in cases involving shared or split custody as provided in La. R.S. 9:315.9 and 315.10.

Discussion
The trial court found that the mother was capable of making at least minimum wage and ordered her to pay $200 per month in child support.
To the extent that the trial court concluded the mother was voluntarily underemployed, we find that it abused its discretion. The record indicates that the mother was living in Bossier Parish because she was married to a serviceman who was assigned to Barksdale Air Force Base. The mother is no longer married to the father, and he is no longer stationed at Barksdale. The mother understandably chose to move back home to Redwater, Texas, where her parents and other members of her extended family reside. She testified that she has no relatives in Louisiana. However, Redwater is apparently a much smaller town with more limited financial opportunities. Unfortunately, she has not found employment there providing compensation matching her former pay.[2] There is no indication that her move home was made in bad faith. Furthermore, there is no evidence that the mother changed jobs to avoid her financial responsibilities to her children or to deliberately antagonize the father.
We have reviewed the child support worksheets in the record. We find that the appropriate one computes the mother's child support obligation as $193.49 per month. Additionally, we note that the trial court found that the mother should be relieved of her support obligation during July when she had the children for the entire month. We will amend the judgment accordingly.

CONCLUSION
The trial court judgment naming the father as domiciliary parent is affirmed.
The supplemental trial court judgment requiring the mother to pay child support of $200 per month is amended to reduce the amount to $193.49 per month and to relieve her of her support obligation for the month of July. The judgment is amended as follows:
*1146 IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of WILLIAM ERIK LUPLOW, SR., and against JENNIFER MICHELLE LUPLOW, ordering her to pay unto him the sum of $193.49 per month for the care and support of the two (2) minor children of the marriage, to be divided equally between them, except for the month of July when she has custody of the children for the entire month and is relieved of her child support obligation.
Costs of this appeal are assessed equally between the parties.
CHILD CUSTODY JUDGMENT AFFIRMED; SUPPLEMENTAL CHILD SUPPORT JUDGMENT AMENDED AND RENDERED.
NOTES
[1] The father asked the mother to move out. She went to stay with friends, and he kept the children. When the father filed for divorce, the mother moved back into the home. The father then left, taking the children with him, and moved to his mother's house. Thereafter, the parties worked out an arrangement by which the children went back and forth between the parents.
[2] She formerly worked at an embroidery store; in Redwater, she obtained a job at a dress store.