960 So.2d 186 (2007)
Ned MARTELLO
v.
Laurie B. MARTELLO.
No. 2006 CU 0594.
Court of Appeal of Louisiana, First Circuit.
March 23, 2007.
*189 Dana A. Bolton, Baton Rouge, for Plaintiff-Appellant Ned Martello.
D. Blayne Honeycutt, Fayard & Honeycutt, Denham Springs, for Defendant-Appellee Laurie B. Martello.
Before: PARRO, GUIDRY, and McCLENDON, JJ.
PARRO, J.
This is an appeal from a judgment in connection with a hearing on matters incidental to a divorce. For the reasons that follow, we amend in part and affirm as amended. We also vacate in part and remand with instructions.

Factual and Procedural Background
On September 1, 1995, Ned Martello (Ned) and Laurie Bales (Laurie) entered into a prenuptial agreement; they were married on September 9, 1995. Of their marriage, two children were born: Nicholas on February 29, 1996, and Ned "Jacob" on August 30, 1999. Jacob was born with disabilities and is a special needs child.
On December 16, 2004, Ned filed a petition for divorce and incidental relief. On December 30, 2004, the parties executed a letter agreement purportedly canceling the prenuptial agreement. Subsequently, Laurie filed an answer and a reconventional demand. In response to her filing, Ned filed an answer, a first supplemental and amending petition, and a rule to set the incidental matters for a hearing.
Following a hearing on July 7, 2005, on the merits of the incidental matters, the trial court found that both parties were at fault in the breakup of the marriage, and Laurie's request for final periodic spousal support was denied. Nonetheless, the trial court ordered Ned to pay directly to Laurie interim spousal support of $3,500 per month from July 7, 2005, until six months after the signing of the judgment of divorce.[1] As additional items of interim spousal support, the trial court ordered Ned to make monthly payments for the note on the mortgage on the former matrimonial domicile, the note on a 2004 Yukon, and the insurance premiums on the Yukon. *190 Joint custody of the minor children was ordered, with Laurie designated as the domiciliary parent, subject to physical custody by Ned every other weekend from Friday until Sunday and two days and two nights each week. In connection with the calculation of child support, the trial court determined that Ned's monthly gross income was $9,000 and that Laurie's was $0. Using these figures, the trial court found that Ned's basic child support obligation was $1,553 a month. Additionally, Ned was ordered to pay $819.17 monthly on account of Jacob's special needs, as well as 100 percent of all extraordinary expenses. As to the prenuptial agreement, the trial court found that the cancellation document was valid and enforceable. Laurie was granted the use of the former matrimonial domicile and the 2004 Yukon owned by Ned's business, Martello Chiropractic Clinic.
Ned appealed and urged that the trial court erred in the following respects:
1. failing to designate him as the domiciliary parent,
2. ordering him to pay interim spousal support after a determination had been made that Laurie was not free from fault in the breakup of the marriage,
3. finding that his monthly gross income was $9,000,
4. failing to impute an income to Laurie for purposes of establishing child support,
5. assessing interim spousal support at more than 50 percent of his gross income,
6. ordering him to pay 100 percent of the out-of-pocket expenses of the minor children,
7. ordering him to pay $819.17 monthly for the special needs of their disabled child when monthly tuition was only $430.83,
8. finding that the document purporting to be a cancellation of the prenuptial agreement was valid and enforceable,
9. failing to determine the effect of the cancellation agreement,
10. granting Laurie the exclusive use of the former matrimonial domicile, and
11. granting Laurie the exclusive use of the 2004 Yukon owned by Martello Chiropractic Clinic.[2]

Domiciliary Parent Designation
In his petition for divorce, Ned averred that it was in the best interest of the children for the parties to be awarded joint custody, care, and control of the minor children, with him being named as the domiciliary parent. In her answer, Laurie also sought joint custody and designation as the domiciliary parent. The trial court awarded joint custody. Based on its finding that Laurie had in the past assumed and exercised the position of the primary caretaker parent, the trial court designated Laurie as the domiciliary parent. Ned complained that the trial court erred in failing to designate him as the domiciliary parent.
In the absence of an agreement, the court shall award custody to the parents jointly. LSA-C.C. art. 132. To the extent it is feasible and in the best interest of the children, physical custody of the children should be shared equally. LSA-R.S. 9:335(A)(2)(b). Nonetheless, the trial court's finding that joint custody is in the *191 best interest of the child does not necessarily require an equal sharing of physical custody. See Stephens v. Stephens, 02-0402 (La.App. 1st Cir.6/21/02), 822 So.2d 770, 777. The implementation order should allocate the time periods during which each parent shall have physical custody of the children so that the children are assured of "frequent and continuing contact" with both parents. LSA-R.S. 9:335(A)(2)(a). In a decree of joint custody,[3] the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown. LSA-R.S. 9:335(B)(1).
The primary consideration in a child custody determination is always the best interest of the child. LSA-C.C. art. 131. Louisiana Civil Code article 134 enumerates the following twelve nonexclusive factors that are relevant in determining the best interest of the child:
(1) The love, affection, and other emotional ties between each party and the child;
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child;
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs;
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment;
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes;
(6) The moral fitness of each party, insofar as it affects the welfare of the child;
(7) The mental and physical health of each party;
(8) The home, school, and community history of the child;
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference;
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party;
(11) The distance between the respective residences of the parties; and
(12) The responsibility for the care and rearing of the child previously exercised by each party.
The best-interest-of-the-child test under LSA-C.C. arts. 131 and 134 is a fact-intensive inquiry, requiring the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented in each case. Romanowski v. Romanowski, 03-0124 (La.App. 1st Cir.2/23/04), 873 So.2d 656, 659. Every child custody case is to be viewed on its own peculiar set of facts and the relationships involved, with the paramount goal of reaching a decision which is in the best interest of the child. Id.
The trial court is vested with broad discretion in deciding child custody cases. Because of the trial court's better opportunity to evaluate witnesses, and taking into account the proper allocation of trial and appellate court functions, great deference is accorded to the decision of the trial court. A trial court's determination regarding child custody will not be disturbed *192 absent a clear abuse of discretion. Stephens, 822 So.2d at 774.
In challenging the trial court's designation of Laurie as the domiciliary parent, Ned did not attack the trial court's weighing and balancing of the factors listed in LSA-C.C. art. 134. Rather, his focus was on the fact that he filed the petition for divorce because of Laurie's habitual lifestyle choices of partying, staying out until 3:00 or 4:00 in the morning, and sneaking into the house through a window. Both parties testified that Ned was home with the children while Laurie was out partying. Ned has been the primary financial supporter of the minor children. However, the record provides reasonable support for a finding that Laurie had been the primary caretaker for the minor children throughout their marriage and, specifically, had cared for the disabled child his entire life. Furthermore, at Ned's request, the trial court set Ned's physical custody with the minor children every other weekend beginning on Friday and ending on Sunday and two days and two nights during each week. Under this plan, Laurie would have the children three days and three nights during each week and alternating weekends. Based on these circumstances, we cannot find that the trial court abused its discretion or was manifestly erroneous in its decision to designate Laurie as the domiciliary parent.

Interim Spousal Support
A. Propriety of Award
A spouse may be awarded an interim spousal support allowance based on the needs of that spouse, the ability of the other spouse to pay, and the standard of living of the spouses during the marriage. LSA-C.C. art. 113. Absent a pending demand for final spousal support, an award of an interim spousal support allowance shall terminate upon the rendition of a judgment of divorce. LSA-C.C. art. 113. The spouse seeking interim spousal support bears the burden of proving his or her entitlement to it. Romanowski, 873 So.2d at 663-64. The trial court is vested with much discretion in determining an award of interim spousal support. Such a determination will not be disturbed absent a clear abuse of discretion. Id.
At the conclusion of the hearing, the trial court first addressed the issue of the parties' fault in the breakup of the marriage. The parties were both found to be at fault in the breakup of their marriage.[4] Relying on LSA-C.C. art. 113, Ned urged that this fault finding precluded a subsequent award of interim spousal support in Laurie's favor. Article 113 provides:
Upon motion of a party or when a demand for final spousal support is pending, the court may award a party an interim spousal support allowance based on the needs of that party, the ability of the other party to pay, and the standard of living of the parties during the marriage, which award of interim spousal support allowance shall terminate upon the rendition of a judgment of divorce. If a claim for final spousal support is pending at the time of the rendition of the judgment of divorce, the interim spousal support award shall thereafter terminate upon rendition of a judgment awarding or denying final spousal support or one hundred eighty days from the rendition of judgment of divorce, whichever occurs first. The obligation to pay interim spousal support may extend beyond one hundred eighty days from the rendition of judgment of divorce, but only for good cause shown.
*193 In addition to seeking interim spousal support in her reconventional demand, Laurie asserted a demand for final spousal support. The judgment rendered on July 7, 2005, that awarded interim spousal support also denied Laurie's claim for final periodic spousal support, based on the finding of fault. Accordingly, Laurie's claim for final spousal support was no longer pending. Therefore, Ned urged that the award of interim spousal support in Laurie's favor was inappropriate.
With the judgment of divorce being rendered and signed on September 21, 2005, there clearly was no claim for final spousal support pending at the time of the rendition of the judgment of divorce. Thus, the second sentence of LSA-C.C. art. 113 pertaining to the duration of an award for interim spousal support when a claim for final spousal support is pending at the time of the divorce is inapplicable. The termination of an interim spousal support award was instead governed by the first sentence of LSA-C.C. art. 113, which authorizes a court to award a party interim spousal support when a demand for final spousal support is pending, as well as upon the motion of a party. Thus, the fact that there was no longer a claim for final spousal support pending when the award of interim spousal support was made is not fatal to a claim for interim spousal support. However, LSA-C.C. art. 113 directs that such an award would terminate by operation of law upon the rendition of the judgment of divorce, which in this case was on September 21, 2005. For these reasons, although we find no legal error in the trial court's ordering of Ned to pay interim spousal support after a determination had been made that Laurie was not free from fault in the breakup of the marriage, we conclude that the trial court erred in ordering that the payment of interim periodic support continue for six months after the signing of the judgment of divorce. The judgment will be amended accordingly.
B. Amount of the Award
Article 113 authorizes an interim spousal support award after the court considers the needs of the claimant and the other party's ability to pay, in light of the standard of living enjoyed by the parties during the marriage. LSA-C.C. art. 111, Revision Comments-1997, comment (b); LSA-C.C. art. 113, Revision Comments-1997, comment (a). The needs of the claimant spouse, in this case, the wife, have been defined as the total amount sufficient to maintain her in a standard of living comparable to that enjoyed by her prior to the separation, limited only by the husband's ability to pay. See Jones v. Jones, 38,790 (La.App. 2nd Cir.6/25/04), 877 So.2d 1061, 1072. This type of support is designed to preserve and continue the status quo insofar as maintenance and support are concerned. See id. It relates to facts as they have existed during the time the parties were living together and as they actually exist at the time the litigation commences, not to future possibilities and capabilities. See Arrendell v. Arrendell, 390 So.2d 927, 930 (La.App. 2nd Cir. 1980). The trial court is afforded much discretion in determining whether to make an award of interim spousal support, and such a determination will not be disturbed absent a clear abuse of discretion. Jones, 877 So.2d at 1072.
The trial court's award of interim spousal support in the amount of $3,500, plus $2,241 in payment of specified monthly obligations, was based on a finding that Ned and Laurie had a prior agreement as to the amount of support to which Laurie *194 was entitled.[5] Laurie explained that when she and Ned first separated, Ned gave her $3,500 per month. He also paid all the major bills, totaling approximately $2,241,[6] as well as expenses related to Jacob's special needs. Admittedly, the $3,500 payment was for the support of Laurie and the children. Laurie did not know what portion was attributable to child support or spousal support.[7] Accordingly, we conclude that the record does not provide a reasonable basis for finding that the parties had agreed that Ned would be responsible for paying $3,500 monthly in interim spousal support directly to Laurie. The trial court's finding to the contrary is manifestly erroneous.
Laurie testified that her monthly expenses totaled $12,331. This amount included $1,169 for housing, $200 for pool and yard maintenance, and $2,330 in monthly obligations on various credit cards. These expenses were being paid directly by Ned, and the $630 monthly note for the automobile and $143 monthly premium for automobile insurance were being paid by the clinic. Additionally, $3,995 was attributable to direct expenses for the children. The remaining expenses listed on her financial statement were for utilities ($534), food ($1,000), gas and oil ($400), and personal expenses of Laurie ($500 for clothing/uniforms, $200 for cleaning/laundry, $125 for medical/dental, $325 for hygiene, $500 for entertainment, and $280 for other expenses).
According to Laurie, the $3,500 payment that she had been receiving from Ned was barely enough to make ends meet and was insufficient to maintain her and the children in the standard of living they enjoyed prior to the separation. Although this court believes that to be true, we are also mindful that the amount of interim spousal support is subject to limitation, based on the payor spouse's ability to pay.[8]See LSA-C.C. art. 113.
The total award of interim spousal support to Laurie, $5,741, is approximately 64 percent of Ned's monthly gross income, which the trial court found to be $9,000.[9] Thus, after satisfying his monthly obligations for interim spousal support in the amount of $5,741 and child support in the total amount of $2,372.17 per month as ordered by the court, Ned would be left with $886.83[10] of his gross monthly income to use toward his own expenses. Considering the facts of this case and the trial *195 court's finding that Ned's monthly gross income was $9,000, we conclude the trial court abused its discretion in setting Laurie's award of interim spousal support. Given Laurie's needs, Ned's ability to pay, and Laurie's entitlement to an amount in keeping with the standard of living enjoyed by the spouses during the marriage, we conclude that the most the trial court could have reasonably awarded in direct payment to Laurie in interim spousal support is $2,300 per month through the date of the rendition of the divorce. The judgment will be amended accordingly.

Child Support
A. Custodial Arrangement
In his petition, Ned sought an award of joint custody and designation as the domiciliary parent. In her reconventional demand, Laurie also sought joint custody, but with her being designated as the domiciliary parent. Pursuant to these requests, the trial court awarded joint custody of the children with a domiciliary parent as contemplated by LSA-R.S. 9:315.8, as opposed to shared custody as defined by LSA-R.S. 9:315.9. The basic child support obligation was set at $1,553, of which Ned was responsible for paying 100 percent.
In challenging the trial court's award of joint custody, Ned simply attacked the designation of Laurie, as opposed to him, as the domiciliary parent. We have already determined the trial court did not abuse its discretion in making this designation. Nonetheless, in attacking the amount of the award of child support, Ned urged that the trial court erred in using Worksheet A of LSA-R.S. 9:315.20 in calculating his child support obligation. According to Ned, Worksheet B should have been utilized, since the parties share equally the physical custody of the minor children.
Louisiana Revised Statute 9:315.9 contains the formula for calculating child support when the parents have shared custody. "Shared custody" is defined as "a joint custody order in which each parent has physical custody of the child for an approximately equal amount of time." LSA-R.S. 9:315.9(A)(1). The formula differs from the typical child support formula, in that it has a built-in adjustment for the duplication of costs that inevitably occurs in a shared custody arrangement,[11] and is applied to reflect the actual percentage of time the child spends with each parent. Janney v. Janney, 05-0507 (La.App. 1st Cir.7/26/06), 943 So.2d 396, 399, writ denied, 06-2144 (La.11/17/06), 942 So.2d 536; see LSA-R.S. 9:315.9(A)(2) & (3). When the joint custody order is deemed to provide for shared custody, the parent with the lesser percentage of time with physical custody does not have the additional burden of proving, as he or she does under LSA-R.S. 9:315.8, an increase in direct child-related expenses and a concomitant decrease in the other parent's direct child care expenses.[12]
In determining whether a particular arrangement is shared, LSA-R.S. 9:315.9 does not bind the trial court to a threshold percentage determined solely on *196 the number of days.[13] Rather, the statute mandates an "approximately equal amount of time." The trial court has discretion in determining whether a particular arrangement constitutes "shared custody," justifying the application of LSA-R.S. 9:315.9. Janney, 943 So.2d at 399.
The custody arrangement ordered by the trial court in this case gave Ned custody of the children approximately 42.85 percent of the time. The trial court awarded joint custody, without an express determination of whether the split of physical custody constituted shared custody, and utilized Worksheet A, rather than Worksheet B, in calculating the basic child support obligation. We find no error or abuse of discretion in the trial court's apparent conclusion that the joint custody order in this case did not provide each parent with physical custody of the child for an "approximately equal" amount of time. Therefore, the trial court did not legally err in computing child support in accordance with the formula in LSA-R.S. 9:315.8 and Worksheet A of LSA-R.S. 9:315.20.
B. Determination of Ned's Gross Income
Child support is a continuous obligation of both parents; children are entitled to share in the current income of both parents and should not be the economic victims of divorce. LSA-R.S. 9:315(A). Income means the actual gross income of a party, if the party is employed to full capacity. LSA-R.S. 9:315(C)(5)(a). Pursuant to LSA-R.S. 9:315(C)(3)(c), gross income includes:
Gross receipts minus ordinary and necessary expenses required to produce income, for purposes of income from self-employment, rent, royalties, proprietorship of a business, or joint ownership or a partnership or closely held corporation. "Ordinary and necessary expenses" shall not include amounts allowable by the Internal Revenue Service for the accelerated component of depreciation expenses or investment tax credits or any other business expenses determined by the court to be inappropriate for determining gross income for purposes of calculating child support.
Ned was in business for himself as Martello Chiropractic Clinic. The clinic's monthly income was $21,000, which was the same as in 2002. Ned explained that although business had declined as much as 20 percent, actual receipts had remained about the same due to superior collection efforts. Documentation prepared by Ned in 2002 for submission to a lending institution in connection with a loan application showed approximately $6,700 in business expenses per month. This documentation indicated that Ned expected that his expenses would decrease with the maturation of three large overhead expenses in the next eleven months. Nonetheless, Ned offered *197 evidence which suggested that the clinic's current monthly expenses had increased to $13,927.69. He attributed the additional expenses to the purchase of an x-ray machine, hiring of an employee to handle collections, income tax liability, higher rent, yellow page advertising costs, and malpractice insurance premiums. Based on the evidence presented, the trial court determined that the clinic's expenses were $12,000 per month. Ned urged that $13,927.69 should have been accepted as the expense figure, since there was no contradictory evidence offered. He maintained that if these expense figures had been accepted, his monthly gross income would have been $7,072.31, as opposed to $9,000.
In assessing the clinic's average monthly expenses at $12,000, the trial court apparently believed the clinic's expenses had increased from 2002 to 2005 due to circumstances beyond Ned's control. However, the trial court clearly did not believe that such expenses had more than doubled during this time. Considering the evidence in the record and the inherent credibility call made by the trial court on this issue, we conclude that the trial court's finding of $12,000 in average monthly business expenses is reasonably supported by the record and is not manifestly erroneous.
C. Determination of Laurie's Gross Income
Without determining Laurie's potential income, the trial court found that her gross income was zero, because she was no longer allowed to work at Ned's clinic. Ned urged that the trial court erred in failing to impute an income to Laurie for purposes of establishing the basic child support obligation.
As previously stated, child support is a continuous obligation of both parents; children are entitled to share in the current income of both parents and should not be the economic victims of divorce. LSA-R.S. 9:315(A); see LSA-C.C. art. 141, Revision Comments1993. In the case of a party who is voluntarily unemployed or underemployed,[14] LSA-R.S. 9:315(C)(5)(b) and 9:315.2(B) provide that income means the potential income of the party and, in such a case, gross income, unless the party is caring for a child of the parties under the age of five years. See LSA-R.S. 9:315.11; Walden v. Walden, 00-2911 (La.App. 1st Cir.8/14/02), 835 So.2d 513, 530 (Lanier, J., concurring in part and dissenting in part). Voluntary unemployment or underemployment for purposes of calculating child support is a question of good faith on the obligor-spouse. Romanowski, 873 So.2d at 660. When determining whether a party is voluntarily unemployed or underemployed for purposes of calculating a child support obligation, the court shall consider that party's earning capacity in light of all circumstances. Luplow v. Luplow, 41,021 (La. App. 2nd Cir.2/28/06), 924 So.2d 1135, 1144-45.
Laurie testified that she had worked prior to the marriage, but did not give any details. She explained that she worked in collections at her husband's chiropractic clinic for approximately six hours a week, earning $4,000 per month. Her employment with the clinic ended with the breakup of the marriage, and Ned hired someone else to do the work that Laurie had been performing. Based on Ned's unwillingness *198 to allow Laurie to continue to work for the clinic, the trial court found her income to be zero. In reaching this decision, no mention was made as to Laurie's earning potential. Since Laurie was neither physically or mentally incapacitated nor caring for a child under the age of five,[15] Ned argued that the trial court erred in not imputing an income to Laurie for purposes of calculating child support.
Laurie noted that she personally has cared for the minor children their entire life and that Jacob, who is severely disabled, required her attention 100 percent of the time. Based on the needs of her disabled child, Laurie maintained that she is unable to work. In discussing Laurie's need for interim spousal support in its oral reasons for judgment, the trial court urged Laurie to get educated in order to put herself in the position to maintain some type of gainful employment and become more self-sufficient. It is implicit in these comments that the trial court did not believe the needs of her children would preclude Laurie's ability to obtain gainful employment.
Laurie's collection work for the clinic shows that she is able to earn an income. Although she has a child with special needs, he attends school full time. The evidence further shows that Jacob has been left in the care of a third party. The petition for divorce was filed on December 16, 2004, around which time Laurie's employment with the clinic was terminated. The hearing on incidental matters was held on July 7, 2005. The record does not reveal that Laurie made any effort to obtain employment during this time.
Absent any evidence that Laurie is incapable of being employed,[16] we conclude that Laurie was voluntarily unemployed. Although Laurie's unemployment immediately following the separation may have been in good faith, her initial involuntary unemployment does not indefinitely relieve her of her obligation to contribute to the financial support of her children. Rather than look for employment, Laurie chose to rely on the support being given to her and the children by Ned. Therefore, we conclude that the trial court erred in failing to consider Laurie's potential income in determining the parties' basic child support obligation. Accordingly, we vacate that portion of the judgment ordering Ned to pay $1,553 for his basic child support obligation.
Although it is questionable under the facts of this case that gross income in the amount of $4,000 per month should be imputed to Laurie, the evidence certainly indicates that she is capable of some type of employment.[17] Absent any evidence as to Laurie's true earning potential, we remand the matter to the trial court for evidence on this issue and a determination of Laurie's income-earning potential, taking into consideration Jacob's special needs and the other facts and circumstances of this case. Once this determination has been made, the trial court shall be responsible for establishing the basic child support obligation of each parent in accordance with LSA-R.S. 9:315.2.
*199 D. Expenses for the Children
Although Ned asserted that the trial court erred in finding that the monthly tuition for the program needed by their disabled child was $819.17, this issue was not briefed by him and is considered abandoned. See Uniform Rules, Courts of Appeal, Rule 2-12.4; Canizaro v. Tangipahoa Parish Sch. Sys., 02-1913 (La.App. 1st Cir.8/20/03), 853 So.2d 741, 744 n. 2.
However, since the trial court's determination of the basic child support obligation may impact the parties' proportionate shares of expenses and extraordinary adjustments, we also vacate that portion of the judgment ordering Ned to pay 100 percent of all extraordinary expenses. On remand, Ned's responsibility for payment of tuition expenses and extraordinary expenses is to be assessed by the trial court, once the basic child support obligation has been determined.

Cancellation of the Prenuptial Agreement
A matrimonial regime is a system of principles and rules governing the ownership and management of the property of married persons as between themselves and toward third persons. LSA-C.C. art. 2325. The matrimonial regime may be legal, contractual, or partly legal and partly contractual. LSA-C.C. art. 2326. The legal regime is the community of acquets and gains. LSA-C.C. art. 2327. A matrimonial agreement is a contract establishing a regime of separation of property or modifying or terminating the legal regime. Spouses are free to establish by matrimonial agreement a regime of separation of property or modify the legal regime as provided by law. The provisions of the legal regime that have not been excluded or modified by agreement retain their force and effect. LSA-C.C. art. 2328.
Spouses may enter into a matrimonial agreement before or during marriage as to all matters that are not prohibited by public policy. Spouses may enter into a matrimonial agreement that modifies or terminates a matrimonial regime during marriage only upon joint petition and a finding by the court that this serves their best interests and that they understand the governing principles and rules. They may, however, subject themselves to the legal regime by a matrimonial agreement at any time without court approval. LSA-C.C. art. 2329.
A matrimonial agreement shall be made by authentic act or by an act under private signature duly acknowledged by the spouses. LSA-C.C. art. 2331. Louisiana Civil Code article 1833[18] defines an authentic act, in pertinent part, as follows:
An authentic act is a writing executed before a notary public or other officer authorized to perform that function, in the presence of two witnesses, and signed by each party who executed it, by each witness, and by each notary public before whom it was executed.
To be an authentic act, the writing need not be executed at one time or place, or before the same notary public or in the presence of the same witnesses, provided that each party who executes it does so before a notary public or other officer authorized to perform that function, and in the presence of two witnesses and each party, each witness, and each notary public signs it.
A matrimonial agreement, or a judgment establishing a regime of separation of property, is effective toward third persons as to immovable property, when filed for registry in the conveyance records of the *200 parish in which the property is situated and as to movables when filed for registry in the parish or parishes in which the spouses are domiciled. LSA-C.C. art. 2332.
Prior to their marriage, Laurie and Ned entered into a prenuptial agreement establishing a regime of separation of property. This document was recorded in the conveyance records of Livingston Parish to serve as notice to third persons. On December 30, 2004, the parties entered into a letter agreement addressed to the clerk of court of the "21st District Court of Louisiana" referred to as a "Cancellation of Prenuptial Agreement" that provided:
After some discussion, together, we, Ned Joseph Martello and Laurie Lynn Bales, Allen, Martello have agreed to have canceled the prenuptial agreement that we had file[d] with this court on or around September 8, 1995 prior to our marriage together in the Parish of Tangipahoa on September 9, 1995. Please enter into record with this court our wish to have said agreement canceled as of this date, December 30, 2004.
This letter agreement was signed by Ned and Laurie before a notary and in the presence of two witnesses. Although addressed to the clerk of court, the content of this notarized document evidenced more than merely a request for cancellation of the recordation of the agreement. It evidences an agreement by the spouses to terminate their contractual matrimonial regime, which was a regime of separation of property. Pursuant to their December 30, 2004 agreement, the parties subjected themselves to the legal regime; thus, court approval was not necessary. See LSA-C.C. arts. 2328, 2329.
Ned challenged the trial court's finding that the cancellation of the prenuptial agreement was valid and enforceable. This document was executed after Ned filed his petition for a divorce.[19] He explained that he drafted the document in an effort to make his marriage work. Ned further explained that he was in desperate need of refinancing the family home, which was subject to an adjustable rate mortgage of 11½ percent, and that Laurie's signature was needed for refinancing. According to Ned, she would only agree to sign the refinancing document if he cancelled the prenuptial agreement. Laurie testified that they had argued about the prenuptial agreement for 10 years. The fact that Ned's gesture did not work in repairing his marriage or was motivated by immediate financial considerations does not mean that there was no meeting of the minds as to the parties' desire to cancel the prenuptial agreement. It is undisputed that Ned was not forced to sign the cancellation agreement, which was done in the presence of a notary and two witnesses. Lacking any evidence that the consent of either party was vitiated by error, fraud, or duress, we find no error in the trial court's recognition of the validity of the December 30, 2004 agreement. See LSA-C.C. art. 1948.
On appeal, Ned further urged that the trial court erred in failing to determine the *201 effect of the cancellation agreement.[20] However, he did not brief this assignment of error. Therefore, this matter is considered abandoned for purposes of this appeal in accordance with the Uniform Rules, Courts of Appeal, Rule 2-12.4.[21]

Exclusive Use of the Matrimonial Domicile
In his petition, Ned sought to be awarded the exclusive use and occupancy of the former matrimonial domicile pending the partition of their property. His argument on appeal focuses primarily on his efforts to be named as the domiciliary parent. Having found no error in the trial court's designation of Laurie as domiciliary parent, we are also unable to find error in the trial court's apparent conclusion that it would be in the best interest of the family that Laurie be awarded the exclusive use and occupancy of the former matrimonial domicile, pending the classification of this property.[22]
In connection with his assignment of error pertaining to the use of the family home, Ned also asserted that the trial court failed to rule on the issue of the fair market rental value of the former matrimonial domicile or on the reimbursement of mortgage payments on said property, which were paid by Ned. Laurie submitted that the judgment's silence as to this issue indicates a denial of any such claim.
LSA-R.S. 9:374(C) provides, in pertinent part:
If the court awards use and occupancy to a spouse, it shall at that time determine whether or not to award rental for the use and occupancy and, if so, the amount of the rent. The parties may agree to defer the rental issue for decision in the partition proceedings. If the parties agreed at the time of the award of use and occupancy to defer the rental issue, the court may make an award of rental retroactive to the date of the award of use and occupancy.
Under LSA-R.S. 9:374(C), the decision to award rent to a non-occupant spouse rests soundly within the trial court's discretion. McCarroll v. McCarroll, 96-2700 (La.10/21/97), 701 So.2d 1280, 1289.
In his petition for divorce and other incidental matters, Ned sought the exclusive use and occupancy of the family home, but made no alternative claim for the fair rental value of the home in the event the court denied this request. Despite Laurie's claim for use and occupancy of the family home in her reconventional demand, Ned still did not seek an award of rental, should the court agree with her claim. Under the circumstances of this case, we find no abuse of discretion in the trial court's failure to make such an award.

Decree
For the foregoing reasons, that portion of the judgment ordering Ned to pay $3,500 a month in interim spousal support *202 directly to Laurie is amended to reduce such payment to $2,300 a month, with said $2,300 monthly payment owed only through the rendition of the judgment of divorce. The portions of the judgment ordering Ned to pay $1553 for his basic child support obligation and ordering Ned to pay 100 percent of all extraordinary expenses are vacated. This matter is remanded to the trial court for further proceedings consistent with this opinion. In all other respects, the judgment is affirmed. Each party is to bear his or her own costs of this appeal.
AMENDED IN PART AND AS AMENDED, AFFIRMED; VACATED IN PART AND REMANDED WITH INSTRUCTIONS.
McCLENDON, J., concurs, and assigns reasons.
McCLENDON, J., concurring.
While I agree with the result reached by the majority herein, I concur in the opinion with respect to the majority's discussion of the effect of the cancellation of the prenuptial agreement. The majority determined that Mr. Martello did not brief this assignment of error as to the effect of the cancellation and therefore, considered it abandoned. However, in his appellate brief, Mr. Martello argued that the document was drafted in an attempt to make his marriage work. He further asserted that the cancellation of the prenuptial agreement was intended to be prospective so that if he and Mrs. Martello reconciled they would live under a community regime after December 30, 2004. Although Mr. Martello set forth a minimal argument, I cannot find that this assignment of error was abandoned. Nevertheless, the trial court judgment merely declared the cancellation document to be valid. Thus, any determination of the effect of the cancellation by this court would be premature. In all other respects, I agree with the majority opinion.
NOTES
[1] The parties were divorced by judgment dated September 21, 2005.
[2] Notably, this vehicle was owned by a nonparty. In his brief, Ned revealed that this vehicle was sold following the hearing on these matters. Accordingly, this assignment of error was abandoned.
[3] "Joint custody" means a joint custody order that is not "shared custody" as defined by LSA-R.S. 9:315.9. LSA-R.S. 9:315.8(E). "Shared custody" means a joint custody order in which each parent has physical custody of the child for an approximately equal amount of time. LSA-R.S. 9:315.9(A)(1).
[4] Laurie did not challenge this finding on appeal.
[5] In light of this purported agreement, the trial court found it inconsequential that the $3,500 award exceeded one-third of Ned's monthly income.
[6] The trial court ordered Ned to continue paying the monthly expenses, such as insurance and the notes on the home and vehicle that she was driving, as part of his obligation of interim spousal support.
[7] We note that in a colloquy following the rendition of the trial court's decision, counsel for Ned informed the court that Ned had been voluntarily paying Laurie $3,500 per month in support, which represented $2,500 in spousal support and $1,000 in child support.
[8] Notably, LSA-C.C. art. 112(B) (1997) provided that the sum awarded under LSA-C.C. art. 112(A) for final spousal support shall not exceed one-third of the obligor's net income. No similar provision is provided with respect to an award of interim spousal support.
[9] As owner of the vehicle that Laurie had been driving, the clinic had been paying the monthly note in the amount of $630 for this vehicle, as well as the monthly insurance premium of $143 associated with that vehicle. With the reduction of these amounts, the remaining portion of interim spousal support would be approximately 55 percent of Ned's gross income.
[10] After reduction for amounts paid by the clinic, Ned would have $1,659.83 of his gross monthly income remaining.
[11] Some of these "redundant costs" include housing expenses, utilities, a bedroom for the child, and toys. Guillot v. Munn, 99-2132 (La.3/24/00), 756 So.2d 290, 299.
[12] A joint custody arrangement that does not constitute shared custody, even though the non-domiciliary parent is granted more than the typical amount of physical custody, may entitle the non-domiciliary parent to a reduction, in the form of a credit, in the amount of child support owed to the domiciliary parent. Janney, 943 So.2d at 399 n. 3, citing LSA-R.S. 9:315.8(E).
[13] The jurisprudence has been inconsistent on this point. In DeSoto v. DeSoto, 04-1248 (La.App. 3rd Cir.2/2/05), 893 So.2d 175, 179, the court found that a 45.5 percent to 54.5 percent split of physical custody constituted a shared custody arrangement triggering application of the statute, and yet approved the trial court's deviation from the statutory guidelines. In so concluding, the court discussed an earlier decision, Lea v. Sanders, 04-762 (La.App. 3rd Cir.12/22/04), 890 So.2d 764, writ denied, 05-0183 (La.3/24/05), 896 So.2d 1046, in which the court had not applied the statute to a 43 percent to 57 percent split and had stated in dicta that comment (a) to the statute provided a bright-line threshold of 49 percent to 51 percent for application of the statute. The DeSoto case specifically rejected any bright-line rule. This court also rejected such a rule, finding in the Janney case that a split of 45.3 percent to 54.7 percent constituted an approximately equal sharing of custody. Janney, 943 So.2d at 400.
[14] A party shall not be deemed voluntarily unemployed or underemployed if he or she is absolutely unemployable or incapable of being employed, or if the unemployment or underemployment results through no fault or neglect of the party. LSA-R.S. 9:315(C)(5)(b).
[15] See LSA-R.S. 9:315.11(A).
[16] Laurie's employment was terminated as a result of the couple's divorce proceedings. The trial court found Laurie was partially at fault in the breakup of her marriage; thus her fault also contributed to the termination of her employment. See LSA-R.S. 9:315(C)(5)(b).
[17] We note also that the children will be with Ned for two days and two nights of every week, which might enable Laurie to be employed on a part-time basis during those periods.
[18] Article 1833 was amended by 2003 La. Acts, No. 965, § 1, effective January 1, 2005.
[19] The fact that this agreement was executed after the filing of the petition for divorce, the date of which filing would serve as the retroactive date for the termination of the community property regime once the judgment of divorce was entered, is not fatal to the determination of its validity, as it is considered to have been executed during the marriage. Although the judgment of divorce terminates a community property regime retroactively to the date of filing of the petition in the action in which the judgment of divorce is rendered, the retroactive termination of the community shall be without prejudice to rights of third parties validly acquired in the interim between the filing of the petition and recordation of the judgment. See LSA-C.C. art. 159.
[20] The effect of the cancellation of the prenuptial agreement depends on whether it resulted in the dissolution of the separate property regime or its termination. Dissolution connotes termination retroactive to the moment of creation of the regime; termination connotes an ending to the regime for the future. See LSA-C.C. art. 2356, Revision Comments-1979, comment (d).
[21] We note also that the determination of whether the cancellation of the prenuptial agreement resulted in the dissolution or the termination of the regime of separation of property is more appropriately resolved in connection with the partition of the parties' property.
[22] The court may determine whether the family home is separate or community property in a contradictory hearing. LSA-R.S. 9:374(D).