PATRICIA RIVET MURRAY, Judge.
|! This is a contentious child custody dispute. Duncan Molony appeals the trial court’s judgment awarding him and his former spouse, Meredith Harris, joint eus-tody of their minor child and designating the parties as co-domiciliary parents. For the reasons that follow, we affirm the joint custody award, reverse the trial court’s co-domiciliary designation, and remand for either the designation of a domiciliary parent or the issuance of an implementation order allocating the parties’ decision-making responsibilities.[1] On remand, we also order that the trial court consider appointing a parenting coordinator pursuant to La. R.S. 9:358.1-9:358.9.
FACTUAL AND PROCEDURAL BACKGROUND
On April 29, 2005, Mr. Molony and Ms. Harris were married. One child was born of the marriage: a boy, CM. CM was born on December 13, 2005; he was four years old when the judgment appealed from was rendered. From a previous marriage to Michael Harris, Ms. Harris has another son, AH.[2] AH was born on February 10, 1999; he was eleven years old when the judgment appealed from was ^rendered. Ms. Harris is AH’s domiciliary parent. She has physical custody of AH during the week, and his father has custody of him on weekends.
Following their marriage, Mr. Molony and Ms. Harris established their matrimonial domicile in New Orleans, although they lived in North Carolina a short period of time following Hurricane Katrina. They returned to New Orleans in 2006 and reestablished domicile there. It is undisputed Ms. Harris had an alcohol abuse problem during the period following Hurricane Katrina and CM’s birth. This contributed to the demise of the parties’ marriage and gave rise to this custody dispute.
*73 On November 14, 2008, Mr. Molony filed for a divorce from Ms. Harris alleging that she had an “alcohol dependency problem.” He further alleged that he “has been the primary care giver for [CM] since his birth.” He requested emergency, temporary sole custody of CM or that he be designated the domiciliary parent and Ms. Harris be allowed supervised visitation. He further requested that Ms. Harris be ordered to submit to random alcohol and drug screenings.
Ms. Harris answered and filed a recon-ventional demand seeking joint custody and designation as the domiciliary parent. She alleged that she had been CM’s primary caretaker since his birth, that she was capable of caring for the child, and that she was not a danger to CM or AH. In support of those allegations, she attached a copy of a letter from her therapist, E. Taylor Aultman, Jr., L.C.S.W., in which Mr. Aultman opined that Ms. Harris, who was attending AA meetings and undergoing weekly therapy, was “a devoted mother” and was not “a danger to her children in any way.”
On December 4, 2008, the trial court entered an interim consent judgment (the “Consent Judgment”) ratifying the parties’ agreement regarding temporary | ¡¡shared physical custody of CM. The Consent Judgment awarded physical custody to Mr. Molony except for a period from 8:00 p.m. on Tuesday until 8:00 a.m. on Wednesday each week. The judgment authorized Mr. Molony to remove CM from the custody of Ms. Harris whenever he believed, based upon observable evidence, that Ms. Harris was under the influence of alcohol or drugs. The judgment ordered Ms. Harris to attend daily AA meetings and to continue her weekly therapy. Finally, the court ordered that Dr. Ellen Gandle, a mental health professional, perform an evaluation, pursuant to La. R.S. 9:331, to assess issues of custody, visitation, and alleged substance abuse by Ms. Harris. The parties were also ordered to meet within thirty days of the date of the hearing to reevaluate the current physical custody schedule.
On January 8, 2009, Ms. Harris filed an Emergency Rule to Modify Visitation. She alleged that the parties had met, but Mr. Molony had refused to provide her with a reasonable increase in visitation. Testimony, which was taken on this issue on January 30, and February 2, 2009, was summarized by the trial court in its reasons for judgment:
Ms. Harris has a history of alcohol abuse and mental health issues predating the filing of the petition for divorce. Ms. Harris’ therapist, Mr. Aultman, has been treating Ms. Harris since March 15, 2007. Mr. Aultman diagnosed Ms. Harris with Alcohol Abuse, Adjustment Disorder with depression and anxiety. She is on Klonipin and Lexapro which were prescribed by Dr. Barnes.
Mr. Aultman, the only mental health professional who testified, opined that he did not feel that Ms. Harris was incapable of managing her two children nor did he believe that Ms. Harris would pose a danger to [CM] or [AH]. Mr. Aultman noted that prior to this divorce action, Ms. Harris had tried to stop drinking but could not sustain her alcohol abstinence. However, he believes Ms. Harris’ current efforts are sincere based upon his treatment of her and his experience with alcohol abusers. He also cited her continued AA attendance. |4Ms. Harris admits she is an alcohol abuser. She testified that she has been sober since November 16, 2008, and has been attending daily AA meetings from two-to-three times per day. Ms. Harris’ AA attendance was corroborated by two AA attendees and Ms. Harris’ sponsor. Ms. Joan Ellen Young, an addiction re *74 covery resource therapist, described Ms. Harris as a loving mother. Ms. Young testified that she babysits [AH] while Ms. Harris attends her AA meetings. Michael Harris, Ms. Harris’ first husband and the father of [AH], testified that he has no concerns about Ms. Harris’ sobriety when she has their minor son. According to Mr. Harris, [AH] has never voiced any concerns about his mother’s behavior. Mr. Molony testified that he separated from Ms. Harris because of her alcohol abuse. Mr. Molony believes that Ms. Harris loves their son; but, he is concerned that she may endanger [CM] by falling “off the wagon.” Mr. Molony described Ms. Harris’ past acts of drunkenness, including an incident where he videoed Ms. Harris on the floor next to bed with [CM] asleep next to her.[3] Mr. Molony could not cite to any examples of child endangerment since Ms. Harris began her self imposed sobriety. Ms. Harris has had [CM] on two overnight visits every week since December 4, 2008, without incident.
On February 2, 2009, the trial court rendered judgment finding it was in CM’s best interest for him to “spend more time with his mother.” The trial court thus modified the physical custody schedule by ordering that Ms. Harris' be allowed to pick CM up from day care on Tuesdays and Wednesdays and to return him to day care the following day. He also ordered that she have visitation on alternating weekends. The order also provided that Ms. Harris continue attending daily AA meetings as well as continue her therapy with Mr. Aultman and Dr. Barnes.
In January 2010, Dr. Gandle issued her report and recommendation. In performing the custody evaluation, Dr. Gandle interviewed the parties (Mr. Molony and Ms. Harris), Dr. Barnes (Ms. Harris’ psychiatrist), Mr. Aultman (Ms. Harris’ therapist), Sarah Molony (Mr. Molony’s sister with whom he lives), UMarian Lebeau (Ms. Harris’ AA sponsor), Mr. Harris (Ms. Harris’ former husband), and two of CM’s day care teachers.
As part of the evaluation, Dr. Gandle’s assistant, Gina Manguno-Mire, Ph.D., administered psychological testing to both parties. As to Mr. Molony, the testing showed no mental health disorder. As to Ms. Harris, the testing showed she had symptoms of alcohol abuse and anxiety disorder not otherwise specified. Dr. Mire noted that Ms. Harris did not suffer from a gross psychiatric or cognitive impairment. She further noted that Ms. Harris had a tendency to minimize some of her present difficulties and symptoms particularly with regard to her alcohol use. She still further noted that Ms. Harris’ “role as a substance abuse counselor has the potential to allow her to intellectualize or minimize her current difficulties and this should be avoided.” Finally, she noted that “[i]n the event that [Ms. Harris] maintains her abstinence from alcohol and illicit substances, she is likely to fulfill her major role obligations.”
In her report, Dr. Gandle made the following recommendations:
• Duncan Molony and Meredith Harris continue to share joint custody with shared physical custody of [CM]. [CM] is at an age where he can tolerate a couple of days away from one parent so the arrangement may want to change to reflect this. Daily telephone contact with the other parent is important unless they are somewhere that is *75 not possible i.e. out of the country. Holidays and the summer should continue as is already established. There is not currently any compelling evidence to suggest that one parent should have sole custody. It is in [CM]’s best interest to have frequent access to both parents at this time.
• [CM] should ideally maintain the same routine at each house. He should go to bed at the same time, sleep in his own bed unless there is a clear reason not to and should be put in pull-ups or underwear to foster toilet training. Both parents must comply with the school regarding toilet training especially because it is hindering his ability to move up to an age appropriate class.
le* The parents may benefit from a facilitator who could work with them on implementing their arrangement and' encourage the consistency needed here. This should be someone who would be comfortable communicating with the court should serious concerns arise or there is a clear lack of consistency at one of the house holds.
• Ms. Harris should continue in treatment with Dr. Barnes and Mr. Ault-man to address her mental health issues and maintain her sobriety. She should ideally attend daily AA meetings to help with her recovery. As accountability is an issue and in light of Mr. Molony’s concerns, I would recommend a method by which accountability could be enhanced regarding Ms. Harris’s alcohol use. Options include frequent but random drug testing (perhaps hair instead of urine) or utilizing a device such as the car breathalyzer system. Should it become apparent that Ms. Harris is using alcohol then I would recommend Mr. Molony assume sole custody of [CM] until the court deems her capable of safely having him back in her custody. If this occurs, I would also recommend she enter either an inpatient treatment program or an intensive day treatment program. Obviously it is in [CM]’s best interest that his mother remain in recovery.
• No one should smoke around [CM] considering his history of asthma.
• Each party should foster [CM]’s relationship with the other parent. No disparaging remarks about either parent should be made in the presence of [CM]. This applies to extended family and friends.
On March 5, 2010, Ms. Harris filed a motion to set hearing on final custody and visitation. On June 17, 2010, the hearing on Ms. Harris’ Rule for Custody was held. At the hearing, the following four witnesses testified: Mr. Molony; Ms. Harris; Ms. Harris’ first husband, Mr. Harris; and the court-appointed evaluator, Dr. Gandle. The depositions of Ms. Harris’ therapist, Mr. Aultman, and her psychiatrist, Dr. Barnes, were introduced. Mr. Aultman’s therapy records also were introduced.[4]
|7On June 28, 2010, the trial court rendered judgment concluding that based on the factors set forth in La. C.C. art. 134 it is in CM’s best interest for the parties to have a shared joint custody arrangement and be designated co-domiciliary parents. The trial court thus rendered judgment on Ms. Harris’ Rule for Custody ordering that:
• The parties shall have shared joint custody of the minor child, [CM];
• The parties shall alternate physical custody on a week on week off basis, from Sunday at 6:00 p.m. until the *76 following Sunday at 6:00 p.m., beginning with Ms. Harris on July 4, 2010. Each party shall be responsible for picking up the minor child before their respective visitation begins.
• The parties are designated co-domiciliary parents and shall communicate as it relates to the health, education, and welfare of the minor child.
• Ms. Harris shall no longer be required to produce her AA attendance records.
• Ms. Harris shall continue her therapy with Mr. Aultman and her medication management with Dr. Barns [sic].
• Mr. Aultman shall no longer be required to share' his reports, regarding Ms. Harris’s treatment with Mr. Molo-ny or his counsel.
• Neither party shall listen to the other parent’s phone calls with [CM].
This appeal by Mr. Molony followed'.
DISCUSSION
The paramount consideration in any determination of child custody is the best interest of the child. Evans v. Lungrin, 97-0541, 97-0577, p. 12 (La.2/6/98), 708 So.2d 731, 738; see La. C.C. art. 131. In determining the best interests of the child, the trial court is required to consider the twelve, nonexclusive factors set forth in La. C.C. art. 134.[5] Nonetheléss, the trial court is not required to analyze | ^mechanically all of the dozen factors; rather, the court should balance and weigh the factors in view of the evidence presented. Palazzolo v. Mire, 08-0075, p. 37 (La.App. 4 Cir. 1/7/09), 10 So.3d 748, 769-70. The trial court has the discretion to determine the relative amount of weight each factor should be given. Mire v. Mire, 98-1614, pp. 3-4 (La.App. 4 Cir. 3/24/99), 734 So.2d 751, 753.
The best interest of the child determination under La. C.C. arts. 131 and 134 is a fact-intensive inquiry, requiring the weighing and balancing of the factors in favor and in opposition of awarding custody to the competing parties on the basis of the evidence presented in the particular case. Martello v. Martello, 06-0594, p. 5 (La.App.1Cir.3/23/07), 960 So.2d 186, 191. Thus, in custody cases the trial court’s determinations generally are based heavily on factual findings. Palazzolo, 08-0075 at p. 34, 10 So.3d at 768 (citing Richardson v. Richardson, 07-0430 (La.App. 4 *77 Cir. 12/28/07), 974 So.2d 761). An appellate court cannot set aside a trial court’s factual findings in the absence of manifest error or unless those findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). When the factual findings are based on the credibility of witness’s testimony, the fact finder’s Indecisión to credit a -witness’s testimony must be given great deference by the appellate court. Id.
“The appellate courts- have reiterated the traditional rule that a trial court’s custody award will not be disturbed absent a manifest abuse of discretion.” La. C.C. art. 134, Revision Comment (b). The rationale behind this traditional rule is that the trial judge is in the best position to ascertain the best interest of the child based on the particular circumstances of the particular case. See McKenzie v. Cuccia, 04-0112, pp. 3-4 (La.App. 4 Cir. 6/23/04), 879 So.2d 335, 338 (citing Thompson v. Thompson, 532 So.2d 101 (La.1988)).
On appeal, Mr. Molony contends that the trial court erred in finding it was in CM’s best interest to grant shared joint custody on a (seven day) week on, week off physical custody schedule; to designate the parties as co-domiciliary parents; and to ignore Dr. Gandle’s recommendations regarding physical custody and the implementation of accountability measures given Ms. Harris’ admitted use of alcohol. Mr. Molony’s contentions can be divided into four issues: joint versus sole custody, physical custody, legal custody (the domiciliary parent designation), and accountability measures. We separately address each issue.

Joint versus sole custody

Joint custody must be ordered absent the parents’ consent to sole custody, a history of family violence, or clear and convincing evidence that sole custody is in the child’s best interest. Snowton v. Snowton, 09-0600, p. 3 (La.App. 4 Cir. 9/30/09), 22 So.3d 1111, 1113. The parent seeking sole custody has the burden of | ^demonstrating by clear and convincing evidence that the granting of sole custody to that parent is in the child’s best interest. La. C.C. art. 132.[6]
In finding that an award of joint custody was in CM’s best interest, the trial court expressly stated that it considered the La. C.C. art. 134 factors. In determining that joint custody should be awarded, the parties agree that the trial court applied the correct legal standard — the best interest of the child. The parties, however, disagree on whether the trial court’s award of joint custody was factually correct. To address this issue, it is necessary to consider the pertinent evidence presented at trial.
Mr. Molony, who is an information security analyst, works mostly out of his home and has a flexible work schedule. He currently resides with his sister, Sarah Molony, on the west bank of New Orleans. He lives about fifteen miles from the day care that CM attends. He drops CM off at day care in the morning. Often his sister, who works on the east bank, picks CM up from day care and brings him *78 home. According to Mr. Molony, he has been CM’s primary caretaker since birth. He has taken CM to almost all of his doctor visits and cared for the child when the child was sick. Mr. Molony indicated that he communicates with Ms. Harris regarding significant matters by either email or text message to both of her cell phones. Mr. Molony agreed that Ms. Harris typically provides him with adequate notice of when she will be out of town.
|uMr. Molony testified that CM has been exhibiting poor behavior, which he described as acting out, throwing tantrums, and difficulty potty training. Although he suggested to Ms. Harris that CM see a child psychologist to address these problems and attempted to schedule an appointment, Ms. Harris refused to allow it until the custody litigation was over.
In addition, Mr. Molony related two incidents that caused him to suspect that Ms. Harris was abusing alcohol again. Neither occurred when Ms. Harris had physical custody of CM. In the first, Mr. Molony called Ms. Harris when she was out of town in February 2009 so that she could speak to CM, but found she was slurring her words and was difficult to comprehend. She then spoke with CM for about ten minutes. However, when Mr. Molony spoke to her the next day, she did not recall having talked to CM on the phone. On another occasion, Mr. Molony became suspicious that Ms. Harris had been drinking after he had spoken to her on the phone while in Orlando, Florida. Because Ms. Harris would not admit to him that she had been drinking on either occasion, Mr. Molony testified that he was unaware that this was occurring until Dr. Aultman’s 2010 deposition. He further testified that her admission to Dr. Aultman substantiated his fears that Ms. Harris had, in fact, been drinking on the two prior occasions that had aroused his suspicion.
In addition, Mr. Molony testified that when he takes CM grocery shopping the child still points to the wine and requests they buy some for his mother. Also, the private investigators he hired to follow Ms. Harris for several days in preparation for the custody trial reported to him that they had seen Ms. Harris buy a bottle of wine from Super Serve and take it home.
| ^Michael Harris, Ms. Harris’ first husband and the father of AH, testified that he and Ms. Harris have an amicable relationship. He sees Ms. Harris often — four to five times a week. Since November 2008, he has not seen her drinking or intoxicated. He testified that Ms. Harris drank when he was married to her, that he knows she goes to AA but that he could not say if she was an alcoholic. Although Ms. Harris told him that she has had an occasion in the past few months to have a glass of wine, Mr. Harris testified this did not cause him any concern regarding AH’s safety. Mr. Harris testified that he has witnessed Ms. Harris interact with both her children — CM and AH — and that she has a good relationship with both. He testified that he has no concerns about Ms. Harris’ ability to parent.
Ms. Harris testified that she works partially from her home, but is required to travel for her job. Although she has some flexibility in her work schedule, she sees clients for scheduled appointments, which places limitations on her flexibility. Ms. Harris testified that she lives on the east bank of New Orleans about a mile from the day care CM attends. Ms. Harris characterized her relationship with Mr. Molony as contentious. She acknowledged that she refused to allow CM to see a child psychologist until after this child custody dispute was completed. She also acknowledged having driven while intoxicated in the past but has not done so since this case *79 began. She denied having ever received a DWI.
Ms. Harris testified that for the nineteen months preceding the custody trial she had complied with the requirements of the Consent Judgment — attending daily AA meetings, producing her AA attendance records (calendar), attending weekly therapy with Mr. Aultman, and seeing Dr. Barnes for medication management. Moreover, she testified that during that nineteen month period she had consumed only one or two glasses of wine on two occasions, both of which occurred while | isshe was out of town for work. Ms. Harris testified that she informed Mr. Aultman about those two occasions.
Ms. Harris acknowledged having received Dr. Gandle’s January 2010 report, which stated that should Ms. Harris use alcohol, it would be recommended that Mr. Molony assume sole custody. When asked why, being aware of that recommendation, she still had drunk wine on. two occasions in 2010, Ms. Harris admitted that she had made a mistake but noted that “it was just one drink with dinner.”
Dr. Gandle, the court-appointed mental health expert, was accepted as an expert in forensic psychiatry. As noted, she had issued her recommendation to the court in January 2010. Dr. Gandle testified that Ms. Harris had provided a history of substance abuse dating back to high school. Dr. Gandle indicated there was no indication Ms. Harris was using any substance besides alcohol. According to Dr. Gandle, Ms. Harris informed her that she had not drunk during her pregnancy with CM, but had resumed drinking when she returned to New Orleans post Katrina, which was a stressful time. Dr. Gandle acknowledged that neither she, nor any of the other experts (Dr. Mire, Dr. Barnes, or Mr. Aultman) had found Ms. Harris to be alcohol dependent.
Dr. Gandle also testified that she did not find any discernable difference between the parties’ houses, that CM was comfortable in both houses, and that he had a good relationship with both parents. Dr.- Gan-dle noted in her report that “Mr. Molony appears to be the better organized parent although there is no concrete evidence that Ms. Harris is unable to care for [CM] and foster his development.” She further noted that “[CM] needs a good, healthy relationship with both parents” and that “[h]e also needs to maintain his sibling relationship with [AH].” Dr. |14Gandle recommended that the parties “should continue to share joint custody” and that “both of them were equally capable of making decisions in [CM]’s best interest.”
At trial, Dr. Gandle emphasized that her recommendations were based on information she had at the time she rendered the report. She further testified that it would be important to have additional information as to whether Ms. Harris had resumed abusing alcohol before “recommending such an extreme change” as awarding sole custody to Mr. Molony. Assuming Ms. Harris had resumed drinking, Dr. Gandle testified that she would have some concerns, especially if the drinking was occurring during the time Ms. Harris had CM.
Dr. Gandle further testified that if since November 2008, the extent of Ms. Harris’ alcohol consumption were one glass of wine in April 2010 and another one in May 2010 it would not prompt her to recommend that Mr. Molony have sole custody.
Mr. Aultman, an expert in clinical social work, testified that he began treating Ms. Harris on March 15, 2007, for anxiety and depression. His diagnosis of Ms. Harris was adjustment disorder with depression, anxiety, and alcohol abuse. He described her alcohol abuse as a pattern; that is that *80 she drinks more when she is upset. During the first year he treated her, she occasionally — about every two to three months — abused alcohol. During that time he did not have any concerns regarding her drinking or her ability to care for the children because “it didn’t seem like the drinking was on a daily basis.” It was more episodic and would occur when she was out with friends. However, given that Ms. Harris had an alcoholic family background, Mr. Aultman suggested that she go to AA. Although Ms. Harris adopted that suggestion, she did not regularly attend AA meetings until she |1swas served with Mr. Molony’s divorce petition. Mr. Aultman had never recommended in-patient alcohol treatment for Ms. Harris because her situation did not warrant it.
Mr. Aultman testified that Ms. Harris always mentioned her children; he never got the impression that she was not adequately caring for her them. Indeed, he found that “she was quite devoted in terms of that.” He, as Dr. Gandle, opined that Ms. Harris should have joint custody of CM. His opinion would change if she was not able to maintain her sobriety on a regular basis or if she was seen driving with her children while drunk.
Dr. Aultman corroborated Ms. Harris’ testimony that she had informed him about the two occasions in 2010 on which she had drunk wine. That information did not concern him because there was no evidence that she was abusing alcohol, no evidence that she was getting drunk.
Dr. Barnes, Ms. Harris’ treating psychiatrist, testified he has treated Ms. Harrris off and on since 1997 (for the last thirteen years). He testified that he has treated her with medication for depression and anxiety. He also diagnosed her with alcohol abuse — not dependency — around the time of the filing of the divorce. He testified that his treatment focused on medication management and that she was currently taking anti-anxiety medication (Buspar and Klonopin) and an anti-depressant (Celexa).
Based on the above evidence, the trial court concluded that “it would be in [CM’s] best interest for the parties to have a shared joint custody arrangement.” In support of his contention that the trial court erred in failing to award sole custody to him, Mr. Molony relies on Dr. Gandle’s recommendation that “[sjhould it become apparent that Ms. Harris is using alcohol then I would recommend Mr. |1fiMolony assume sole custody” and that “she enter either an inpatient treatment program or an intensive day treatment program.” He notes that Ms. Harris went against the experts’ recommendation and admitted that she had used alcohol only months before the custody trial even though she was aware of Dr. Gandle’s alternate recommendation. Mr. Molony’s argument equates drinking with abuse of alcohol. He contends that given Ms. Harris’ admission to drinking, the trial court should have adopted Dr. Gandle’s alternate recommendation and awarded sole custody to him.
However, as the trial court stated in its reasons for judgment, “Dr. Gandle qualified her opinion by stating that she would need to know the amount and frequency of Ms. Harris’s alcohol use. Dr. Gandle testified that, although drinking was ‘concerning’, it would not be a problem unless it leads to alcohol abuse or poor decision making.” The trial court further noted that both Mr. Aultman and Dr. Barnes had indicated that Ms. Hams’ occasional, social use of alcohol would not pose a problem with regard to joint custody of CM. The trial court still further noted that Michael Harris similarly testified that “he would not be concerned about [AH’s] safety if Ms. Harris had a glass of wine.” *81 Based on the evidence presented, the trial court found that Ms. Harris was doing much better. . Although she admitted having used alcohol in 2010 the court found it could not conclude that she was abusing alcohol.
Based on the record, the trial court was not manifestly erroneous in finding that Mr. Molony had not established, by clear and convincing evidence, that an award of sole custody to him was in CM’s best interest. We affirm the finding that joint custody is in CM’s best interest. See Everett v. Everett, 438 So.2d 705, 708 117(La.1983)(recognizing the well-recognized tenet in Louisiana jurisprudence that an award of child custody is not a tool to regulate human behavior).

Physical custody

In the alternative, Mr. Molony contends that the trial court abused its discretion by modifying the current physical custody arrangement — two day on, two day off, and alternating weekends — to a week on, week off schedule. He contends that Dr. Gandle recommended that the parties should continue the current physical custody arrangement and that Ms. Harris testified that the current arrangement was working fine.
Although Dr. Gandle recommended that the current physical custody arrangement be maintained, she expressly noted in her recommendation that CM would benefit by having more time apart from each parent and suggested the parties make this change. The trial court’s adoption of a week on, week off schedule therefore is consistent with Dr. Gandle’s recommendation.
Although Ms. Harris testified at trial that the current visitation schedule was working, she expressed her preference for a 50/50 arrangement, such as the week on, week off schedule. She explained that the current schedule was problematic. Because she had her other son, AH, on weekdays, she felt that the two children were vying for her attention when she brought CM home on Tuesday. She also testified that, because the week was broken up, there was -no sense of continuity, which made it difficult for the boys to develop a good relationship. She characterized her having CM for only two days per week as “very interruptive,” and stated her belief that “he would be more able to feel more settled in at each household if he had more time.”
| iSMr. Molony’s only testimony regarding his preference for the schedule was that he was willing to be flexible as long as he had assurances that Ms. Harris was going to maintain her sobriety. Given her history, he was very concerned about that, but he would be comfortable with liberal visitation if “controls were in place to keep that in check.”
He cites Perm v. Penn, 09-0213, p. 7 (La.App. 5 Cir. 10/27/09), 28 So.3d 304, 308, for the proposition that “a custody dispute must be decided in light of its peculiar set of facts and the relationships involved in order to reach a decision that is in the best interest of the child.” Id. We agree, but find Mr. Molony’s reliance on Penn to be misplaced as that case is distinguished from the instant case both factually and legally.
Factually,- it was not feasible for the father in Penn to exercise a' true shared 50/50 custody because of his work schedule. Both Mr. Molony and Ms. Harris work at home, for the most part, and have the flexibility in their work schedules to accommodate CM’s child care needs, as demonstrated by the custody arrangement that has been in place since February of 2009. Legally, contrary to Mr. Molony’s suggestion, the appellate court in Penn did not reverse the joint custody award; rath *82 er, it designated Mrs. Penn as the domiciliary parent — a joint custody concept. See La. R.S. 9:335.
Considering the particular circumstances of this case, we cannot conclude the trial court abused its discretion in setting the physical custody schedule.

Legal custody (the domiciliary parent designation)

The legal effects of a determination of joint custody are addressed in La. R.S. 9:335, which provides that the court shall render a joint custody implementation order designating the time periods during which each parent shall li9have physical custody, which should be shared equally to the extent feasible. The statute further provides, in pertinent part:
B.(l) In a decree of joint custody the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown.
(2) The domiciliary parent is the parent with whom the child shall primarily reside, but the other parent shall have physical custody during time periods that assure that the child has frequent and continuing contact with both parents.
(3) The domiciliary parent shall have authority to make all decisions affecting the child unless an implementation order provides otherwise. All major decisions made by the domiciliary parent concerning the child shall be subject to review by the court upon motion of the other parent. It shall be presumed that all major decisions made by the domiciliary parent are in the best interest of the child.
The trial court herein ordered that “the parties are designated co-domicilary parents and shall communicate as it relates as to the health, education, welfare of the minor child.” This designation does not comply with the mandate of La. R.S. 9:335(B) that the court “shall designate a domiciliary parent.” Although La. R.S. 9:336 provides that “[j]oint custody obligates the parents to exchange information concerning the health, education, and welfare of the child and to confer with one another in exercising decision-making authority,” we find no authority for the court to designate the parties as co-domiciliary parents. See Ketchum v. Ketchum, 39,082, p. 11 (La.App. 2 Cir. 9/1/04), 882 So.2d 631, 639 (noting that there is “no authority in the law for a designation of ‘co-domiciliary’ parents.”)
The statute does permit the court to decline to designate a domiciliary parent if one of two exceptions applies: (1) a valid implementation order to the contrary must have been provided by the trial court, or (2) good cause not to name a domiciliary parent has been shown, neither of which is applicable to this case. There is no implementation order specifying the authority and responsibility ofj^each parent with regard to CM. Nor do we find anything in the record that constitutes good cause for declining to follow the statutory requirements of appointing a domiciliary parent.
We, therefore, remand this matter to the trial court for an evidentiary hearing and for either the designation of one parent domiciliary parent or the issuance of an implementation order specifically delineating the legal authority and responsibility of each parent with regard to the health, education, and welfare of CM. On remand, we also strongly recommend to the trial court that it consider appointing a parenting coordinator pursuant to La. R.S. 9:358.1-9:358.9. See Palazzolo, 08-0075 at pp. 54-56, 10 So.3d at 779-80 (extensively discussing the appointment of a parenting *83 coordinator in high-conflict custody cases such as this one).[7]
In order for the court to appoint a parenting coordinator on its own motion or on the motion of a party, good cause must be shown. For this purpose “good cause” has been defined to include the following: (i) a determination by the court that either or both parties have demonstrated an inability or unwillingness to collaboratively make parenting decisions without assistance of others or insistence of the court; (ii) an inability or unwillingness to comply with parenting agreements and orders, (iii) a determination by the court that either or both parties have demonstrated an ongoing pattern of unnecessary litigation, (iv) a refusal to communicate or difficulty in communicating about and cooperation in the care of |21the children, and (v) a refusal to acknowledge the right of each party to have and maintain a continuing relationship with the children. La. R.S. 9:358.1, Comment (c). Several of these factors are present in this case. Moreover, appointing a parenting coordinator is supported by Dr. Gandle’s recommendation that “the parents may benefit from a facilitator who could work with them on implementing their arrangement and encourage the consistency needed here.” Based on the record it is apparent that both parties are caring, intelligent, capable adults who are devoted to CM. A parenting coordinator to assist them in dealing with conflicts and tensions that may arise could be beneficial to them; this certainly would be in CM’s best interests.

Accountability measures

Mr. Molony’s final contention is that the trial court should have adopted the enhanced accountability measures Dr. Gandle, the court-appointed expert, recommended to ensure Ms. Harris’ sobriety and to protect CM’s best interest. He contends that Ms. Harris is minimizing her symptoms regarding her current alcohol use. In this regard, he cites Dr. Mire’s opinion that her testing indicated that Ms. Harris may be minimizing her symptoms. Mr. Molony notes that Ms. Harris has attempted to recover from alcohol abuse before, pointing out that Mr. Aultman’s treatment records indicate a “pattern of recovery and relapse similar to her current admitted use.” He contends, therefore, that it is in CM’s best interest for the court to protect him by implementing the suggested accountability measures to coincide with Ms. Harris’ treatment and to prevent the likelihood of relapse.
In response, Ms. Harris stresses that Mr. Molony offered no expert testimony to support his position regarding the need for accountability by her. She |22notes that Dr. Gandle’s recommendation seemed geared toward reassuring Mr. Molony rather than necessary to ensure that CM is protected.
In rejecting Dr. Gandle’s recommended accountability measures, the trial court in its reasons for judgment stated that it “was not persuaded by Dr. Gandle’s testimony regarding the need for Ms. Harris to *84 attend daily AA meetings, install a breathalyzer in her vehicle, or undergo random alcohol testing.” Continuing, the court stated that “Ms. Harris’s treating mental health providers are in a better position to guide her care; as such, it defers to their opinions.” Both of Ms. Harris’ treating mental health providers disagreed with Dr. Gandle’ recommended safeguards.
The great discretion and deference granted to the fact finder on appellate review extends to its assessment of expert testimony. McKenzie v. Cuccia, 04-0112, p. 6 (La.App. 4 Cir. 6/23/04), 879 So.2d 335, 339 (citing Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990)). Further, the trial court may substitute common sense and judgment when such a substitution appears warranted by the record. Id. (citing Verret v. Verret, 34,982 (La.App. 2 Cir. 5/9/01), 786 So.2d 944). After weighing and evaluating the expert and lay testimony, the trial court may accept or reject any expert’s opinion. McKenzie, supra. The trial court did so in this case. At trial, Dr. Gandle was questioned about the safeguards she recommended, and she acknowledged that the safeguards were not an absolute guarantee of Ms. Harris’ sobriety. Both of Ms. Harris’ treating mental health providers, Mr. Aultman and Dr. Barnes, disagreed with Dr. Gandle’s recommended safeguards, and the trial court deferred to their opinion.[8]
12aMr. Aultman’s testimony belies Mr. Molony’s contention such measures are warranted because Ms. Harris has exhibited a pattern of failed recovery. Although Mr. Aultman testified that twice before Ms. Harris had indicated she was going to stop drinking and then started again, he indicated that the present circumstances are qualitatively different than the prior circumstances when she attempted to stop drinking. Mr. Autlman opined that he believes the current situation is different for three reasons: (i) the custody issue, (ii) Ms. Harris “now sees that she had more of a problem,” and (iii) she does not deny it. He also noted that she is now attending AA daily and that she has a different attitude about her drinking in that she sees it as a serious issue not just a concern.
The record reflects that Ms. Harris maintained her sobriety. Confronted with this evidence and conflicting expert opinions, the trial court’s decision not to require accountability measures beyond continuance of therapy was not manifestly erroneous.

DECREE

For the foregoing reasons, the trial court’s judgment is reversed insofar as it designates the parties as co-domiciliary parents and is affirmed in all other respects. This case is remanded for the trial court to either designate a domiciliary parent or issue an implementation order specifying the parties’ decision-making responsibilities. The trial court is also ordered to consider appointing a parenting coordinator pursuant to La. R.S. 9:358.1-9:358.9.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

. In an earlier appeal, this court affirmed the trial court's judgment denying Ms. Harris’ request for interim spousal support. Molony v. Harris, 09-1529 (La.App. 4 Cir. 10/14/10), 51 So.3d 752.

. The initials of the two minor children involved in this case, CM and AH, are used in this opinion in order to protect their privacy.

. In a footnote, the court noted here that "[t]his incident does beg the question of why Mr. Molony if he was concerned about the welfare of his minor son would allow his minor son to sleep in the bed with his alleged intoxicated and unclothed wife.”

. The evidence presented at trial is discussed elsewhere in this opinion.

. La. C.C. art. 134 provides:
The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
(1) The love, affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
(3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
(4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
(5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties.
(12) The responsibility for the care and rearing of the child previously exercised by each party.

. La. C.C. art. 132 provides:
If the parents agree who is to have custody, the court shall award custody in accordance with their agreement unless the best interest of the child requires a different award.
In the absence of agreement, or if the agreement is not in the best interest of the child, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear -and convincing evidence to serve the best interest of the child, the court shall award custody to that parent.

. The purpose behind the Parent Coordinator Act is explained in the comments, which state:
Parenting coordination is a child-focused alternate dispute resolution process in which a duly qualified parenting coordinator assists parents or persons exercising parental authority to implement a parenting plan by facilitating the resolution of their disputes in a timely manner and by reducing their child-related conflict so that the children may be protected from the impact of that conflict. The parenting coordinator assists the parties in promoting the best interests of the children by reducing or eliminating child-related conflict through the use of the parenting coordination process.
La. R.S. 9:358.1, Comment (a).

. We note that Dr. Gandle admitted that the accountability measures she recommended could not guarantee Ms. Harris’ sobriety.