# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 13-699

DANETTE WILLIAMS MCMANUS

VERSUS

BRYAN KEITH MCMANUS

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2009-5923
HONORABLE GUY E. BRADBERRY, DISTRICT JUDGE

**********

## PHYLLIS M. KEATY
## JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Phyllis M. Keaty, Judges.

**Thibodeaux, Chief Judge, dissents and assigns written reasons.**

**AFFIRMED.**

**Henry R. Liles**
**Attorney at Law**
**940 Ryan Street**
**Lake Charles, Louisiana 70601**
**(337) 433-8529**
**Counsel for Plaintiff/Appellee:**
        **Danette Williams McManus**

**Walter M. Sanchez**
**The Sanchez Law Firm, L.L.C.**
**901 Lakeshore Drive, Suite 1050**
**Lake Charles, Louisiana 70601**
**(337) 433-4405**
**Counsel for Defendant/Appellant:**
      **Bryan Keith McManus**

**KEATY, Judge.**

Bryan Keith McManus appeals a custody determination and judgment rendered by the trial court. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Bryan and Danette Williams McManus were divorced on February 23, 2012. A stipulated judgment awarded Bryan and Danette joint custody of their two minor children, Londyn Blaire McManus (Blaire) and Brysley Kate McManus. Danette was named domiciliary parent, and Bryan was given structured visitation. On July 30, 2012, Danette was admitted into the psychiatric ward of Lake Charles Memorial Hospital after consuming alcohol and prescription medication.[1] Bryan subsequently filed a Petition for Ex Parte Award of Custody. An ex parte order granted Bryan temporary custody of the minor children. Danette filed a Motion and Order to Vacate Ex Parte Order, Rule for Contempt of Court, and Alternatively for Unsupervised Telephone Access which was denied by the trial court. Danette filed supervisory writs with the third circuit and supreme court. Both writs were denied.

On November 30, 2012, and December 4, 2012, a hearing was held regarding Bryan's rule for modification of custody. On December 18, 2012, the trial court issued its oral ruling and reasons for judgment, and it signed a judgment on January 28, 2013, awarding the parties joint custody with Bryan to remain as the temporary domiciliary parent, subject to future status conferences. The purpose of these future status conferences was to determine Danette's mental status in contemplation of her resumption as the domiciliary parent. The judgment also

---

[1] Bryan argues that this incident was a suicide attempt; whereas, Danette argues that it was not a suicide attempt.

provided for an independent assessment of Danette's psychological health by an expert of the trial court's choosing. The judgment provided that custody would thereafter revert back to Danette as long as she complied with the requirements outlined therein.

Bryan appeals, asserting that after rendering a considered decree on December 18, 2012, and January 28, 2013,[2] the trial court erred in its final custody determination in direct contravention of the heavy burden rule set forth in *Bergeron v. Bergeron*, 492 So.2d 1193 (La.1986).[3]

## DISCUSSION

### Modification of Child Custody

Bryan asserts that after rendering a considered decree, the trial court erred in designating Bryan as a temporary domiciliary parent, rather than domiciliary parent, in direct contravention of the heavy burden rule set forth in *Bergeron.* Bryan contends that the purpose of the supreme court's holding in *Bergeron* was to ensure that a heavy burden was applied in any future modifications of custody, negating any temporary designations of custody after a considered decree is issued. Bryan alleges that the status conferences contemplated by the considered decree

---

[2] Bryan refers to the December 18, 2012 oral ruling and the January 28, 2013 judgment as a considered decree. "A *considered decree* is an award of permanent custody in which the trial court receives evidence of parental fitness to exercise care, custody, and control of children." *Evans v. Lungrin*, 97-541, 97-577, pp. 12-13. (La. 2/6/98), 708 So.2d 731, 738 (citing *Hensgens v. Hensgens*, 94-1200 (La.App. 3 Cir. 3/15/95), 653 So.2d 48, *writ denied*, 95-1488 (La. 9/22/95), 660 So.2d 478).

[3] In *Bergeron*, 492 So.2d 1193, 1200, the supreme court held that the standard of review in cases where the trial court has previously entered a considered decree of permanent custody is as follows:

> [T]he party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by a change of environment is substantially outweighed by its advantages to the child.

2

are also contrary to the *Bergeron* standard. Bryan asks this court to reverse that portion of the trial court's ruling purporting to modify its designation of him as domiciliary parent and void any modifications of custody rendered in any subsequent status conference.

In opposition, Danette contends that the January 28, 2013 judgment was an interim ruling rather than a considered decree. As such, the interim ruling was proper.

In reviewing child custody determinations, the trial court's decision "'is to be afforded great deference on appeal and will not be disturbed absent a clear abuse of discretion.'" *Martin v. Martin*, 11-1496, p. 2 (La.App. 3 Cir. 5/16/12), 89 So.3d 526, 528 (quoting *Franklin v. Franklin*, 99-1738 (La.App. 3 Cir. 5/24/00), 763 So.2d 759). Louisiana Civil Code Article 131 directs that "[i]n a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interest of the child." As such, custody cases are to be decided upon their "own particular facts and circumstances," keeping in mind that "the paramount goal is to do what is in the best interest of the minor children." *Hebert v. Blanchard*, 97-550, p. 4 (La.App. 3 Cir. 10/29/97), 702 So.2d 1102, 1105.

Louisiana Civil Code Article 134 provides twelve relevant factors the trial court "shall" consider in determining the best interest of the child. Those factors include: (1) the love, affection, and emotional ties between each party and the child; (2) the capacity of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child; (3) the capacity of each party to provide the child with material needs such as clothing, food, and medical care; (4) the length of time the child has lived in an adequate, stable environment and the desirability of maintaining that environment; (5) the

3

permanence, as a family unit, of the proposed or existing custodial home(s); (6) the moral fitness of each party with respect to how it affects the welfare of the child; (7) the physical and mental health of each party; (8) the community, school, and home history of the child; (9) the reasonable preference of the child; (10) the ability and willingness of each party to facilitate a close and continuing relationship between the child and the other party; (11) the distance between the residences of the parties; and (12) the responsibility for the rearing and care of the child previously exercised by each party.

## Trial Court's Ruling and Reasons for Judgment

Keeping in mind the above, we must determine the propriety of the trial court's oral ruling and reasons for judgment on December 18, 2012, and subsequent written judgment on January 28, 2013. If the trial court was correct in setting the judgment for future review while designating Bryan as temporary domiciliary parent, then Bryan's argument is without merit.

As mentioned above, the judgment provided that both parents were awarded joint custody with Bryan designated as the temporary domiciliary parent. Danette was ordered to continue treatment with her psychiatrist, Dr. Charles Murphy, as well as continue psychotherapy with Brenda LaFleur, LCSW. Danette was also required to submit to an independent assessment by John Simoneaux, Ph.D., the trial court's expert. Dr. Simoneaux was ordered to render a recommendation to the trial court by June 11, 2013, as to Danette's ability to resume primary domiciliary care. It also ordered a future status conference with Dr. Murphy and Ms. LaFleur to take place on March 12, 2013. Both were required to submit written reports regarding Danette's progress. A second status conference was scheduled to take place on June 11, 2013, with Dr. Simoneaux, Dr. Murphy, and Ms. LaFleur. The

4

purpose of these conferences was to discuss Danette's progress and determine her fitness to resume primary domiciliary custody.

The trial court's oral ruling and reasons provide that the hearing for modification of custody arose out of Danette's alleged suicide attempt on July 30, 2012. It recognized and discussed its obligation to weigh all of the La.Civ.Code art. 134 factors in order to "determine the best interest of these children." In doing so, the trial court concluded that factor one weighed equally in favor of both parents. With respect to factor two, the court was concerned with Blaire's struggles in school after Bryan obtained ex parte custody and with the fact that Bryan was unaware of Blaire's low and failing grades during two semesters while in his custody. It acknowledged that Blaire, while in Danette's care, was on the honor roll. Although the trial court partially attributed the failing grades to moving the children to a new school, it indicated that this factor favored Danette.

The trial court found that factors three, five, and six weighed equally in favor of both parents. As to factor eight, it noted that the children resided primarily with Danette and only visited with Bryan four days a month, concluding that factor eight favored Danette. Factor nine was found to be irrelevant.

With respect to factor ten, the trial court indicated that Danette introduced evidence that Bryan excluded her from the lives of the children since he had been granted custody. It found this "disturbing," indicating that this factor was not in Bryan's favor. It found factor eleven irrelevant and factor twelve in Danette's favor. Specifically, the court noted that prior to the incident which resulted in the ex parte order, the children primarily resided with Danette, who was the primary provider for the rearing of the children.

The trial court combined its analysis of factor four, the length of time the children have lived in a stable and adequate environment, and factor seven, the mental and physical health of each party. It found that those two factors were the catalyst for Bryan's filing of the ex parte petition and summarized its analysis of the various witnesses' testimonies and the evidence as they pertained to factors four and seven.

In that regard, the trial court concluded that Bryan was an integral part of his family business which often took him away from his children. It noted that Bryan admitted to drinking daily, although he did not consider himself an alcoholic. The court found that he had a previous history of drug and alcohol abuse and possibly attended rehabilitation in Miami. It further indicated that Bryan was involved in an intimate relationship with his fiancée at the same time that he was involved in a "bizarre" relationship with Danette. The court noted that Bryan and Danette would exchange explicit texts and meet for sex, leading Danette to believe that there was a chance that she and Bryan could reconcile.

The trial court found that the July 30, 2012 incident resulted from a combination of social media excerpts and the behavior of Danette after Bryan finally ended their tumultuous relationship. Danette's version of the incident was that she was a jilted lover who wanted to get back at Bryan. Bryan's version of the incident was that Danette was deranged, unstable, and bent on self-destruction. The trial court stated that it was called upon to determine whether to accept Danette's or Bryan's version, which it referred to as the "crux of this case."

After hearing all of the witnesses' testimonies, the trial court indicated that it was relying on the expert witnesses in determining what was really going on during the July 30, 2012 incident. It stated that it could give greater weight to

expert testimony. In that regard, it discussed Dr. Murphy's testimony, indicating that he initially treated Danette in the hospital following her alleged suicide attempt. In his initial assessment, Dr. Murphy did not feel that Danette was suicidal. Dr. Murphy, however, felt that she needed to continue treating with him. Dr. Murphy was not ready to discharge her because he wanted to do a reassessment.

The trial court also discussed Ms. LaFleur's testimony. Ms. LaFleur treated Danette with psychotherapy after the alleged suicide attempt. She agreed with Dr. Murphy's assessment that Danette was not suicidal or bipolar; nor did she suffer from major depression. Ms. LaFleur opined that Danette had an adjustment disorder with depressive symptoms due to her toxic relationship with Bryan, but that she was doing well in therapy and addressing these concerns. Ms. LaFleur found it significant that Danette acknowledged making mistakes and to some extent bringing the situation on herself.

The trial court found that the testimony of Dr. Todd Peavy, Danette's primary care physician, was important in that he indicated that Danette's vital signs were in the normal range on the night of her hospitalization and that he did not give credence to an alleged suicide attempt. It noted that Nannette Territa-Prejean, an addiction specialist, concluded that Danette did not have a substance abuse or dependency problem.

In concluding its analysis of factors four and seven, the trial court indicated that it still could not determine whether the incident which led to the ex parte petition being filed was a suicide attempt or an attention-grabbing exercise by Danette. In order to ensure that the best interests of the children were being served, the trial court appointed its own expert, Dr. Simoneaux, to conduct an independent assessment of Danette's psychological health to determine whether she had any

7

serious mental health issues which would preclude her from resuming domiciliary care of her children.

The trial court relied on the fourth circuit's finding in *Molony v. Harris*, 10-1316 (La.App. 4 Cir. 2/23/11), 60 So.3d 70, in making its decision to allow Danette to continue treatment with her therapists and/or physicians and to appoint an independent expert to further assess Danette's mental state. In *Molony*, an interim judgment was issued whereby the parties were granted temporary, shared physical custody of the child. The judgment ordered the mother to attend daily Alcoholic's Anonymous meetings and to continue her weekly therapy; it also appointed a mental health expert, pursuant to La.R.S. 9:331, to evaluate and assess issues related to the mother's alleged alcohol abuse. Thereafter, another hearing was held regarding final custody and visitation. In making its determination, the *Molony* court took into consideration all of the expert testimony, including the court-appointed expert and the mother's treating physicians. In the instant case, Dr. Simoneaux's report confirmed that Danette was mentally stable.

Utilizing the evidence above, we keep in mind the role of a trial court judge. In *Turner v. Turner*, 455 So.2d 1374, 1379 (La.1984), the supreme court stated:

> The trial judge sits as a sort of fiduciary on behalf of the child, and must pursue actively that course of conduct which will be of the greatest benefit to the child. It is the child's emotional, physical, material and social well-being and health which are the judge's very purpose in child custody cases. He must protect the child from the harsh realities of the parents' often bitter, vengeful, and typically highly emotional conflict. The legislature has mandated that the judge shall look only to the child's interests.
>
> In furtherance of this important goal, the court has been vested with broad and independent powers. It may, for example, order that an investigation be conducted into the home lives of the parties, the psychological health of the child, or into any other factor which the judge deems to be important in his determination of the child's best

interest.  C.C. 146(C)(3).  In this way, the court can fulfill its obligations to the child.

The trial court indicated that it was following the supreme court's mandate in *Turner* stating:

> It's fundamental, fundamental, that this Court's primary responsibility is to secure and assure the best interest of these children period.  I'm not here to regulate the behavior of parents.  God knows if we wait for parents to begin to act right and do the things they're supposed to do, when are we supposed to take time to ensure the children get this?
>
> We can only describe the actions of some of these parents, and even in this situation, how do you describe that?  I'm with the mental health professionals.  I've got to be convinced that whoever these children are with are going to be doing what's best for these babies.
>
> . . . .
>
> I'm going to remind the parents that the reason why this Court is staying involved, I'm going to stay involved in this case, because at the end of the day I am going to find out what is in the best interest of these children.

Additionally, La.R.S. 9:335(B)(1) provides that "[i]n a decree of joint custody the court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown."  Louisiana Code of Civil Procedure Article 373 further provides that "[a]n expert appointed by a trial court to assist it in the adjudication of a case in which his special skill and knowledge may aid the court is an officer of the court from the time of his qualification until the rendition of final judgment in the case."

In this case, the trial court made it clear that it had good cause not to designate a permanent domiciliary parent until it could reach a conclusion regarding La.Civ.Code art. 134 factors four and seven with the assistance of Dr. Simoneaux along with the additional reports of Dr. Murphy and Ms. LaFleur.  Thus, the trial court did not abuse its discretion in this regard.

With that said, we keep in mind Bryan's main argument that the December 18, 2012 oral ruling and the January 28, 2013 written judgment was a considered decree. We view the judgment, however, as an interim order rather than a final, considered decree. As mentioned above, the trial court was statutorily and jurisprudentially allowed to withhold designating a permanent domiciliary parent until it could reach a conclusion regarding La.Civ.Code art. 134 factors four and seven with the assistance of its expert. Additionally, Bryan's narrow and restrictive interpretation of the *Bergeron* rule fails to consider the trial court's duty to act as a fiduciary on behalf of the children as decreed by the supreme court in *Turner*. Accordingly, Bryan's assignment of error is without merit.

### DECREE

The judgment rendered by the trial court on January 28, 2013, is affirmed. All costs of this appeal are assessed against Bryan Keith McManus.

**AFFIRMED**.

DANETTE WILLIAMS MCMANUS

VERSUS

BRYAN KEITH MCMANUS

**THIBODEAUX, Chief Judge, dissenting.**

Reliance by the majority and the trial court on *Molony v. Harris*, 10-1316 (La.App. 4 Cir. 2/23/11), 60 So.3d 70, is misplaced. In *Molony*, an interim consent judgment was entered regarding temporary shared physical custody of the minor child. A trial was later held on visitation, not custody, and the trial court amended the interim agreement and allowed the minor child to spend more time with his mother. A hearing on *final* custody followed where the court ordered joint custody and designated co-domiciliary status. *Molony* involved the consideration of the latter judgment, that is, the judgment setting final custody and visitation. It had nothing to do with the interim consent judgment involving temporary shared custody and visitation. Those issues had been resolved prior to the hearing on final custody and visitation. Thus, *Molony v. Harris* is inapplicable.

The trial record makes it clear that this was a trial on the *fitness* of the parents at the time of the trial. The issue of *fitness* is the *ratio decidendi* of *Bergeron v. Bergeron*, 492 So.2d 1193 (La.1986). Certainly, a trial court, as *Bergeron* explained, always retains the power to modify a child custody order. Here, the court reserved unto itself the power to change the custody order depending upon various review hearings in the future. That was legal error which interdicted discretionary factual findings and which mandate a de novo review. The mother should have been compelled to show what *Bergeron* requires, that is, a

change of circumstances materially affecting the welfare of the child before the court would consider making a significant change in the custody order as it did here. It should have required the mother to show a deleterious change in circumstances before it would decide to switch custody back to her in June, 2013.

Both the third and second circuits have disapproved of "review hearings." These hearings are not authorized in civil child custody cases. *See, e.g., Brown v. Brown*, 05-1346 (La.App. 3 Cir. 3/1/06), 925 So.2d 662. Judge Genovese, writing as the organ for the court, opined that "it should be noted that review hearings are held in juvenile cases as set forth in La.Ch.Code art. 1454, not in civil custody cases." *Id.* at p. 666. *Brown* was quoted approvingly in *Brown v. Mock*, 43,571-CA (La.App. 2 Cir. 7/16/08), 987 So.2d 892.

These "review hearings" do not serve to foster judicial efficiency nor do they facilitate some semblance of finality of a court judgment. Rather, the "parents' often bitter, vengeful, and typically highly emotional conflict," *Turner v. Turner*, 455 So.2d 1374, 1379 (La.1984) becomes interminable in cases like this one. Why undergo two full days of a trial with lay and expert witnesses and a fully developed appellate record on fitness if anticipated future "review hearings" are not subject to the *Bergeron* standard?

For the foregoing reasons, I respectfully dissent.